DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, Telxon Corp. and Symbol Technologies, Inc., appeal from the Summit County Court of Common Pleas, which entered judgment on a jury award of over $218 million to appellees, Smart Media of Delaware, Inc. (SMI) and William Dupre, for a breach of contract and various tort claims. Mr. Dupre also cross-appeals against Telxon. We affirm in part and reverse in part.
 I. {¶ 2} In 1996, Telxon was engaged in the design, manufacture and marketing of wireless computerized devices, which included hand-held bar-code scanners used by grocery store employees to scan merchandise and monitor inventory. This capability made Telxon a potentially ideal partner for SMI, a start-up company seeking to develop a product called Smart Handle. Smart Handle was envisioned as a computer device mounted on a shopping cart for checkout-at-the-cart convenience through immediate self-scanning of products by the shopper, as well as on-cart advertising, including full-motion videos, price comparisons, electronic coupons, and targeting of specific products based on the shopper's location in the store. While the seed for this idea had originated in the 1970's, and similar ventures had failed in the 1980's, SMI offered a novel approach that was enticing to Telxon: advertisers would commit up-front capital to fund the product rollout, making the otherwise prohibitively expensive device affordable to the grocery stores.
 {¶ 3} From March 1996 to March 1997, SMI and Telxon discussed a proposed joint venture to bring Smart Handle to market, in which SMI would provide the Smart Handle concept and Telxon would provide engineering expertise, funding for a prototype, and marketing for the final product. The parties signed mutual non-disclosure agreements[1] at the outset of these negotiations, but no further written agreements were ever signed. SMI contends that Telxon made numerous verbal promises and that the parties reached verbal agreements during these negotiations, including a commitment by Telxon to invest approximately $3.73 million to the joint venture. Telxon insists that no verbal agreement ever arose from these negotiations, as evidenced by a lack of any written agreement and the contents of the parties' correspondences, which contradict the occurrence of an agreement. According to Telxon, it ultimately declined the Smart Handle joint venture due to SMI's failure to produce the committed advertisers, its perceived product drawbacks, and a rejection of the concept in the marketplace.
 {¶ 4} In 1996, William Dupre was a Vice President with Information Resources, Inc. (IRI), a company that specialized in market analysis of the retail grocery industry. Beginning in May 1996, SMI invited Mr. Dupre to the discussions with Telxon regarding the Smart Handle joint venture. According to Dupre, part of Telxon's verbal agreement with SMI required that he leave IRI to join SMI full time, which he did. Mr. Dupre resigned from IRI and a $150,000 annual salary in exchange for a promised 20% stake in the start-up SMI and a position as Executive Vice President and Chief Operating Officer. While at SMI, Dupre engaged in the further negotiations with Telxon, conducted road-shows for Telxon's clients, and incurred enormous personal debt by forgoing an income for over a year. By 1998, his purported 20% stake was reduced to 1.67% as SMI increasingly sacrificed ownership in exchange for outside investment.
 {¶ 5} During 1996-1997, SMI had simultaneously pursued investors other than Telxon, including Telxon's competitors Symbol Technologies, Inc. and Fujitsu-ICL Retail Systems, Inc. In fact, shortly after ending relations with Telxon in 1997, SMI partnered with Fujitsu to build the prototype. At the same time, SMI obtained $7.8 million in venture capital from outside investors. Bob McCann became CEO of SMI in 1999, and according to his testimony, raised another $12 to $15 million in venture capital over the next year and a half. By September 2003, SMI founder Dennis Blaeuer testified that although SMI had never made a profit they were in the process of raising another $10 to $15 million in a further effort to get to market. Despite these efforts, the Smart Handle product (later renamed Snap Shopper) has yet to emerge in the market, even as of the present date. And, as demonstrated at trial, by September 2003 SMI had failed to obtain any contract with any retailer to bring this product to market.
 {¶ 6} In 1996, however, SMI projected an unwavering belief in its Smart Handle concept, which it prophesied would revolutionize shopping if only a prototype could be revealed to the mass of grocery stores eager for such technology. SMI insists that Telxon, as the reigning leader in such grocery store technology, was equally enamored with its concept, but that Telxon was secretly determined to create its own competing device. According to Telxon, even a perfectly functional product was simply too expensive to profitably install in grocery stores — the real attractiveness of SMI was not so much its concept, which was not at all new, but rather its promise that it had advertisers committed to providing the up-front capital necessary to install the devices. Otherwise, the concept was a nonstarter. Even if the product drawbacks could be overcome and consumer demand incubated; without significant advertiser investment as a catalyst, installation and maintenance of the device was simply too expensive for the competitive grocery store market. By March 1997, the parties had conducted protracted negotiations and attended numerous meetings, but when Telxon indicated that it would need more time, SMI finally grew impatient and chose to pursue a partnership elsewhere.
 {¶ 7} From SMI's perspective, Telxon entered negotiations in March 1996 solely to frustrate SMI's negotiations with other investors, such as its competitor Symbol, and to stall the Smart Handle development. SMI also accused Telxon of using the negotiations as a ruse to obtain SMI's technology and win the race to the market. However, as demonstrated during the extensive trial testimony, SMI's management was unanimous and unequivocal in rejecting any partnership with Symbol, and candidly admitted that negotiations with Symbol were used for its own ruse to spur Telxon into action. Similarly important is that Telxon was not in fact racing to market. As of the present date almost nine years later, Telxon has never produced or marketed a similar device, and Symbol's equivalent device remains at best an exploratory and inchoate concept which has neither attained widespread acceptance in the market nor revolutionized shopping.
 {¶ 8} Although Telxon and SMI seemed to part amicably in March 1997, SMI contacted Telxon again in October 1998, demanding money and threatening legal action, based on promises and oral agreements allegedly made during their 1996 discussions. In response, Telxon filed suit seeking a declaratory judgment that it had never entered any agreement, had never promised any funding, and had never induced SMI in any way. SMI joined several others as defendants, including Mr. Dupre, who collectively counter-claimed for negligent misrepresentation, estoppel, tortious interference with a business relationship, intentional misrepresentation, breach of contract, and fraud. Discovery ensued and the case proceeded to trial.
 {¶ 9} Also during late 1998, Symbol initiated a hostile takeover of Telxon and began to acquire Telxon shares through stock-for-stock transactions with Telxon's shareholders. This action culminated in a merger of Telxon with TX Acquisition Corp. (TX), a Symbol subsidiary, in December 2000, wherein Telxon was acquired by TX but remained as the surviving corporation. Thus, former competitor Symbol became Telxon's parent corporation and sole shareholder in a reverse triangular merger. Importantly, Telxon remains separately incorporated under Delaware law. A dispute remained, as part of the present appeal, as to whether the two companies, post-merger, hold separate corporate identities for liability purposes. However, it is undisputed that Symbol was an outside third party (competitor) during the 1996-1997 negotiations between Telxon and SMI. Furthermore, Telxon remained the sole counterclaim defendant throughout the discovery process and pretrial preparations, and it was not until the first day of trial, on August 25, 2003, that the counter-claimants first moved the court to substitute or join Symbol to the action.
 {¶ 10} After almost five years of contentious discovery and motion practice, a three-week trial commenced on August 25, 2003. On September 17, 2003, the jury returned verdicts in favor of SMI for $212,340,880 and Mr. Dupre for $6,266,000. The jury also completed interrogatories on its underlying findings. After trial, Mr. Dupre and SMI reiterated their motions to join Symbol to the decision (although SMI later dismissed this motion), and Mr. Dupre moved for prejudgment interest. Telxon and Symbol moved for judgment notwithstanding the verdict, a new trial, remittitur, and a stay of execution. On May 4, 2004, the court entered judgment enforcing the jury verdict and dismissing Telxon's declaratory judgment complaint. The court granted Mr. Dupre's motion to join Symbol to the judgment, but denied prejudgment interest. The court denied Telxon's motions for judgment notwithstanding the verdict, new trial, remittitur, and stay of execution. Telxon and Symbol later obtained a stay by depositing $50 million with the clerk of courts to secure the judgment, pursuant to R.C. 2505.11.
 {¶ 11} Telxon timely appealed to this Court, asserting five assignments of error for review. Symbol also appealed, asserting four assignments of error for review, and this Court consolidated the two appeals. Mr. Dupre cross-appealed, asserting two assignments of error. Because Telxon moved for both a Civ.R. 50(B) judgment notwithstanding the verdict (JNOV) and a Civ.R. 59 new trial, and has appealed the trial court's denial of both, we address each assignment of error as a matter of overall judicial economy.
 II. A. Telxon's First Assignment of Error
"THE TRIAL COURT ERRED IN NOT ORDERING A NEW TRIAL WHEN HIGHLY PREJUDICIAL UNADMITTED EXHIBITS, INCLUDING THE DETAILED WRITTEN REPORT OF COUNTER-CLAIMANTS' EXPERT WITNESS, WERE DELIVERED TO THE JURY ROOM AND USED BY THE JURY IN ITS DELIBERATIONS."
 {¶ 12} Telxon alleges that the trial court erred in failing to grant a new trial. Due to a misunderstanding or oversight by the court bailiff, SMI's expert report was given to the jury during deliberations, even though it had not been admitted into evidence.[2] Telxon contends that the jurors relied on this report in deciding for SMI and in calculating damages. Conversely, Telxon's expert report was not given to the jury, which Telxon argues, caused the jury to assume that the court had endorsed SMI's expert report as being more reliable or authoritative than Telxon's. From all of this, Telxon alleges unfair prejudice that warrants a new trial. We agree.
 {¶ 13} The decision to grant or deny a motion for a new trial pursuant to Civ.R. 59(A) is reviewed for an abuse of discretion. Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312. An abuse of discretion is more than an error of law or judgment, but rather, it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Under this standard of review, an appellate court may not merely substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621. Thus, we proceed from this viewpoint.
 {¶ 14} Among the reasons listed in Civ.R. 59(A), a new trial is warranted upon a finding of sufficient prejudicial error; that which prevents a fair trial. Civ.R. 59(A)(1). Under certain circumstances, prejudicial error may arise from the presence of an unadmitted exhibit being before the jury during deliberations, even if that exhibit arrives inadvertently. Chiesa v. Thomas (1956), 103 Ohio App. 468, 474. See, also, Stiles v. Lawrie (C.A.6, 1954), 211 F.2d 188; Jimenez v. Heyliger
(D.P.R., 1992), 792 F.Supp. 910; Lester v. Sayles (Mo., 1993),850 S.W.2d 858.
 {¶ 15} In Lester v. Sayles, the plaintiff was injured in a car accident and sought recovery for present and future damages. Lester,850 S.W.2d at 863. Plaintiff's counsel prepared a demonstrative chart, expressing a range of damages from $11,408,000 to $19,817,000, and placed the chart on an easel for reference during closing argument. Id. During deliberations, the jury requested the chart and the judge sent it to the jury room, over defendant's objection. Id. The jury returned a plaintiff verdict for $19,817,000 — the exact number depicted on the chart. Id. The Missouri Supreme Court found reversible error, stating: "Articles or exhibits which are neither formally introduced nor constructively introduced are not evidence, and they should never be subject to inspection in the jury room."[3] Id. at 864. The Court reasoned that the jury may have mistaken the opinions in the chart for facts proven in evidence, especially so because, having been sent to the jury room, "it carried the imprimatur of the court, and the implication that its contents were not mere opinion, but authoritative evidence." Id. In closing, the Court held that such circumstances create a presumption of prejudicial error and noted that "the fact that the jury set damages in the exact amount listed on the chart as the `high' total damage award — is certainly consistent with that presumption." Id.
 {¶ 16} In Jimenez v. Heyliger the plaintiff sought recovery on a medical malpractice claim and the two sides presented conflicting expert testimony. Jimenez, 792 F.Supp. at 912. While the jurors were deliberating, a court security officer, without informing the judge, brought the jurors a drawing made at trial by the defendant's expert but did not bring them a contradictory drawing made by the plaintiff's expert. Id. Neither drawing had been admitted into evidence. Id. at 916. The jury returned a defense verdict. Id. at 912. On review, the court found that "refusal to set aside the verdict and order a new trial would be inconsistent with substantial justice," as such errors are "too substantial to be characterized as harmless error."[4] Id. at 913-14. The court first reasoned that significant harm arose from the unknown transfer of the drawing to the jury room because the plaintiff was denied the opportunity to persuade the judge either that the defense drawing should have been kept out or that both drawings should have been sent together. Id. at 915. The court then reasoned that a second major error occurred when the jury was presented with support for only one of the two irreconcilable theories. Id. at 916. "The improper presence of the defendant's drawing within the jury room while the plaintiff's drawing was left outside had a deleterious effect on the jury's ability to properly evaluate the respective theories [of liability], and must be considered grounds for a new trial." Id. See, also, Wright v. PremierElkhorn Coal Co. (Ky.App., 1999), 16 S.W.3d 570, 572 ("Allowing the jury to consider the reports of the defense experts without equal chance to weigh the reports of the [plaintiffs'] experts amounted to undue emphasis on that evidence and resulting prejudice to [plaintiffs]. * * * Furthermore, there is a high likelihood that a jury will be unduly impressed with an inordinate perception of their significance." (Internal citations and quotations omitted.)).
 {¶ 17} We are persuaded by the reasoning of the above cases. In the present case, Telxon and SMI/Dupre presented conflicting experts with SMI's economic expert projecting damage values based on a finding that Telxon was liable and Telxon's principal expert dedicated almost exclusively to repudiating SMI's economic expert. Each expert prepared a report, but neither report was admitted into evidence. However, due to an apparent oversight, the court bailiff sent SMI's economic expert report to the jury room during jury deliberations.[5] While this fact was unknown to the parties or the court, it was clearly known to the jurors. Based on juror affidavits[6] and circumstantial evidence, it is apparent that the jurors relied on the report in reaching a plaintiff's verdict, part of which[7] was an express award of $100,610,880 — an unusually specific value that happens to be depicted exactly to the dollar in Table 7 of SMI's 21-page economic expert report. It is also worth noting that this report is more than financial number crunching, as has been suggested, but presents an analysis of the United States economy in general and the retail grocery store industry in particular, with a technical analysis of how much profit Smart Handle would have made but for Telxon's alleged wrongdoing. The report was comprised of 10 pages of discussion, including two charts, and 11 attached tables of data. As explained above, the presence of one side's report and the absence of the other may create the implication that the judge has endorsed one party's viewpoint over the other and would very likely influence the jury's entire evaluation of the two irreconcilable theories, on liability as well as damages. See Jimenez, 792 F.Supp. at 916; Wright,16 S.W.3d at 572. Thus, we find a presumption of prejudice arising from these circumstances that undermines our confidence in the jury's verdict and which would warrant a new trial. See Lester, 850 S.W.2d at 864;Chiesa, 103 Ohio App. at 474. Accordingly, and as further discussed below, we find that the trial court abused its discretion in failing to grant a new trial.
 {¶ 18} SMI responds that post-verdict juror statements are insufficient by themselves to warrant a new trial, and furthermore, may not lay the foundation for aliunde evidence. See Evid.R. 606(B). While this may be an accurate statement of the law, we find it inapplicable to the present circumstances. We consider it from three viewpoints. From our first viewpoint, SMI cites State v. Schiebel (1990), 55 Ohio St.3d 71, and Cameron v. Alba Ski Sport Hut, Inc. (Aug. 7, 1986), 10th Dist. No. 85AP-1018, to support their proposition. However, Schiebel addressed only juror misconduct: one juror's testimony that another juror had stated during deliberations that he "hated" the defendant. Schiebel,55 Ohio St.3d at 73. Cameron concerned juror misconduct in the form of a juror's admission that she had had reviewed a book, on her own, at the public library, and then shared that information with other jurors.Cameron, supra at *3. The present case does not involve any juror misconduct, but rather concerns outside evidence wrongfully taken, by some officer of the court, to the jury room for use by the jury during deliberations. Thus, the cases cited by SMI provide no authority for the case at hand. From our second viewpoint, we do in fact find aliunde evidence. For instance, immediately upon receipt of the verdict, Telxon expressed dismay over the particular damage numbers:
"[The Court]: Right now I'm dealing with the verdict form and interrogatories. What's inconsistent with them? The numbers? Did you do the math?
"[Telxon]: I can't do the math in a way that comes up with the general verdict form numbers, and also it does not appear that the interrogatory questions that were given to the jury are all in line with the jury instructions or the instructions that the Court gave at the time that the Court and counsel did the interrogatories."
This concern would reasonably lead to further inquiry. Also, as stated above, the number $100,610,880 on the verdict form stands out as peculiarly specific and would warrant further inquiry. Finally, proof that the expert report in question had been submitted to the jury was self-evident: the court's file contained the exhibits submitted to the jury and that file contained this report. All of this is aliunde evidence. From our third viewpoint, we consider a more precise statement of the law on this issue, as articulated by the Sixth Circuit Court of Appeals:
"Generally, a juror's testimony will not be received, either to impeach or support a verdict, but it may be received if it related to extraneous influences brought to bear upon the jurors; they may show by their testimony what the extraneous influence was, and whether it was of a nature calculated to be prejudicial." Stiles, 211 F.2d at 189.
Thus, SMI's legal premise is inaccurate in the present case. Accordingly, we find SMI's aliunde evidence argument incorrect and therefore unavailing.
 {¶ 19} SMI also argues that the trial court did not abuse its discretion in finding the error to be harmless, and insists that the error did not affect a substantial right. The trial court essentially framed this argument for SMI when ruling on Telxon's post-verdict motion for a new trial. While conceding that the jury received the reports in error, the trial court denied Telxon's motion and stated three bases in concluding that the error was harmless: (1) the jury already knew the information in SMI's expert report from the live testimony by the expert, (2) the report could have been admitted and sent to the jury, and (3) Telxon didn't object to the expert or the particular report. SMI defends this explanation and adds additional bases of its own: that Telxon did not prove a substantial right was violated and that Telxon invited the error by failing to police SMI's exhibits. However, we find each of these alleged bases to be strained, unsupportable, arbitrary and unreasonable.
 {¶ 20} Regarding the jury already knowing the information from the live testimony or the use of the chalkboard, we find this unrealistic. The jury was not permitted to take notes, but was told to rely on their collective memories. Over the course of three weeks of trial, the jury heard testimony from 24 witnesses, six of whom were experts. SMI's economic expert testified at length as to numerous calculations and numbers — as did other witnesses — and seemingly wrote many numbers on the chalkboard. In addition, SMI's and Dupre's counsel wrote on the chalkboard and emphasized damage numbers during closing arguments, although no one emphasized the particular numbers actually chosen by the jury. The jury attached certain numbers to its finding of liability on certain claims,[8] one of which was the exact $100,610,880 number depicted in the report. As a practical matter, it was unreasonable for the trial court to ignore the juror's affidavits and the coincidence of this particular number and instead suggest that the availability of SMI's expert report during deliberations was of no more emphasis than having heard it from the witness during the course of trial. Under these circumstances, this is patently unreasonable.
 {¶ 21} Regarding the potential admissibility of the reports and the possibility that they could have been sent to the jury room, this appears to be a pretext, founded only in after-the-fact speculation. While submission of the reports to the jury would be within the discretion of the court, see State v. McGuire (1997), 80 Ohio St.3d 390, 396,1997-Ohio-335, we find it debatable and even doubtful that this particular report was properly admissible. For example, Evid.R. 702(C)(3), governing the admissibility of expert testimony, requires that "the result of a procedure * * * is reliable only if * * * [t]he particular procedure * * * was conducted in a way that will yield an accurate result." This follows the general premise that even relevant evidence may be inadmissible if it is unduly prejudicial, confusing or misleading to the jury. See Evid.R. 403(A). Even without detailed scrutiny, the economic report at issue exhibits patent flaws to its reliability. First, it is a creation of virtual revenues and profits, modeled using input parameters that were admittedly never calibrated to reality, scientifically peer-reviewed, or objectively verified. See Evid.R. 702(C). Next, although it purports to predict conditions arising from an event in 1996-1997, the model is predicated on SMI's business plan from February 29, 2000; three years after the event and almost 15 months after the filing of the lawsuit. Finally, this expert attempted to validate the findings by analogizing SMI's Smart Handle to the businesses of Optimal Robotics Corp. or Catalina Marketing Corp., both of which are currently viable, profitable companies — but neither of which is realistically equivalent to Smart Handle. Optimal Robotics makes the free-standing scanning systems that are becoming commonplace in many grocery stores, wherein the customer scans products and bags groceries in a set-up similar to an ordinary grocery store checkout lane. Smart Handle would be equivalent to this set-up in the way a palm pilot is to a desktop PC. They are not the same thing. As for Catalina, they make the devices that print out the paper coupons that a customer receives from the sales clerk along with the receipt, after paying for the groceries. Smart Handle is equivalent to this in the way a palm pilot is equivalent to a copy machine. They are drastically different things. Meanwhile, the expert completely discounted two very similar companies, Klever Marketing Co. and VideOcart Co., each of which attempted a shopping cart mounted device somewhat similar to Smart Handle, and neither of which ever made a cent of profit.[9] In addition to the evidentiary concerns, Civ.R. 26(B)(4)(b) provides for discovery of expert witnesses and the subject matter of their testimony, and Summit Co. Loc.R. 8.01(D)(8) instructs that "attorneys for all parties should be prepared to * * * exchange reports of any expert witnesses expected to be called upon to testify at trial." However, SMI had not been entirely forthcoming with this, as SMI's expert apparently "updated" the economic report on the eve of his testimony at trial. Although the trial court admitted it, over Telxon's protest, the expert made light of it during his testimony:
"[Telxon attorney]: Is there, then, another report beyond this?
"[SMI's expert]: There is another report that I went over with [SMI's/Dupre's] attorneys last night and they elected not to use it. They said they didn't want to surprise you with a new report.
"[Telxon attorney]: Having surprised me with already a new report once, this thing, they obviously didn't think my heart could take a second surprise.
"[SMI's expert]: One surprise per week is your limit."
Based on the foregoing, we do not find it reasonable to presume that the report was necessarily admissible. This, then, is not a valid basis for harmless error.
 {¶ 22} Returning to our earlier point that submission of the reports to the jury would be within the discretion of the court, see McGuire,80 Ohio St.3d at 396, we concede that the question of the report's admissibility was not put before us specifically, and the possibility remains that it may indeed have been admitted and provided to the jury, at the trial court's discretion. The point is, however, that it was not. It was not offered into evidence where it might have been disputed by Telxon and the trial court made no ruling on its admissibility. From this, and our elaborate discussion of the report's possibleinadmissibility, we must conclude that neither Telxon nor SMI/Dupre had any basis to presume, at the time of trial, that the report wasnecessarily admissible, and rather, had significant reason to presume that it was not admissible. This conclusion aids our analysis of the following arguments, particularly the accusation that Telxon waived objection or invited error by failing to stipulate that neither side would offer their expert reports into evidence when SMI/Dupre proposed that they might do so.
 {¶ 23} Regarding Telxon's alleged failure to object to SMI's economic expert, we find no support for this statement. Telxon did in fact object to this expert, on the record, both before and after his direct testimony. Regarding the failure to object to the reports, the following exchange occurred at the close of SMI/Dupre's counterclaim case:
"[Telxon attorney]: Expert reports are hearsay because they're out of court statements and experts come in to testify giving their live testimony, which can be cross-examined. That was one of the reasons I objected to [SMI's economic expert's] discussions about his two expert reports, not the only reason but one of them. But if it is the Court's intention to admit the experts['] reports, I would like to know that before I proceed with our defense in rebuttal case.
"[The Court]: I don't know whether I'm going to admit them or not. We can talk about it now, if you want to. Are you proposing those reports to go into evidence?
"[Telxon attorney]: They have not told me what they're proposing to do.
"[The Court]: No, I'm asking him now [meaning SMI or Dupre's attorney].
"[Dupre attorney]: I'm sorry, Your Honor.
"[The Court]: Are you proposing that the two reports from [SMI's economic expert] be admitted into evidence?
"[Dupre attorney]: I guess, Your Honor, our view would be, or we would propose to stipulate that if [Telxon] will not be offering their experts' reports, we then would not offer our expert's report.
I guess what I would suggest is [that it is] probably not appropriate for the jury to be reading any of our expert reports. So we would stipulate that [SMI's economic expert's] reports will not be offered as part of our exhibits so long as [Telxon] will stipulate that their experts' reports will not be. They can be marked and so forth, but as long as they're not going to be offered, then we will not offer [SMI's economic expert's report].
"[The Court]: Are you prepared at this time to address that, [to Telxon's attorney]?
"[Telxon attorney]: I can address it only this way thus far: I think my client has been put at a prejudicial disadvantage because of the use of the reports. I think that my experts —
"[The Court]: What do you mean by `the use of the report'? He had his report. He testified as to his. He testified as to his opinions and whether the report goes into evidence, goes into evidence before the jury is one thing, it's whether it can be used by the witness is something else. I mean, routinely reports are used by witnesses.
I assume — I know you didn't have a copy, I assume you didn't have a copy of this second report unless you got it this weekend, but you certainly have had the other report. I assume, you have.
"[Telxon attorney]: He stood and read from his report and worked at the board from his report, and my —
"[The Court]: I have no idea.
"[Telxon attorney]: We'll address the matter of his report in our expert testimony. And if —
"[The Court]: Let's put it this way, it's unlikely that the Court is going to admit any of your reports into evidence —
"[Telxon attorney]: Okay. Thank you.
"[The Court]: — but, obviously, I don't make that decision before I listen to what they have to say.
"[Telxon attorney]: I understand. We'll await word from [SMI and Dupre] which exhibits they wish to offer. We haven't heard that yet.
"[The Court]: Okay."
Foremost, we cannot reasonably read this exchange to represent a waiver by Telxon of an objection to the admission of the report. However, SMI insists that Telxon's refusal to stipulate serves as a waiver of any objection to the admission of SMI's report. Ironically, in its brief on appeal, SMI rebuts its own argument and directs us to the strategic explanation and legal basis for Telxon's decision by citing State v.Filiaggi (1999), 86 Ohio St.3d 230, 241-42, for the proposition that the trial court may admit one side's expert report while excluding the other's. As explained in the preceding paragraphs, Telxon could reasonably have anticipated that the trial court might have excluded SMI's expert reports while admitting Telxon's — thus, there was little incentive for Telxon to stipulate to submitting neither. Moreover, Telxon may have reasonably presumed from this exchange that the trial court was not inclined to admit any reports, at least not without further argument on the subject. Thus, we cannot conclude that Telxon failed to object to the potential admission of SMI's economic expert report, and do not conclude that the failure to stipulate serves as an implicit admission of such.
 {¶ 24} Regarding SMI's contention that Telxon failed to prove a substantial right, we find this argument strained at best. SMI insists that Telxon cannot invoke a per se rule, but rather, each case must be considered on its own circumstances. See Bishop v. Munson Transp., Inc.
(Mar. 27, 2000), 7th Dist. No. 97 BA 62, at *17. With this, we agree. However, as discussed above, the circumstances of this case do demonstrate an impact upon a substantial right, that being the outcome of the jury verdict. See Chiesa, 103 Ohio App. at 474; Lester,850 S.W.2d at 864; Jimenez, 792 F.Supp. at 916; Wright, 16 S.W.3d at 572.
 {¶ 25} Regarding SMI's contention that Telxon is at fault for failing to ensure that SMI or Dupre did not submit these contested and unadmitted exhibits to the jury during deliberations, we cannot find fault with Telxon under the circumstances as documented. It is undisputed that the two sides met at the close of evidence to review the exhibits and cooperatively determine which of the 150+ exhibits would be admitted without opposition. It is also undisputed that neither SMI nor Dupre ever sought to admit the economic expert's report, that the trial court had expressly indicated that it would be unlikely to admit any expert report in any event, and that Telxon had no reason to suspect that SMI or Dupre would include exhibits that had not been discussed. After reaching agreement, the parties brought their respective packages of exhibits to the court bailiff for submission to the jury room, as explained on the record:
"[Bailiff]: To my recollection, now, I can't tell you [the exact form the exhibits were in], each side gave them individually. They [the respective parties] walked into my office and handed me what they said was going to the jury. And it was [all together] and I took it into the jury room just as it was given to me.
"[The Court]: You don't recall whether it was in this form [in a black binder] or whether they were loose?
"[Bailiff]: No. I recall there was a binder. I think that [SMI's attorney] gave me that right after the trial finished and then the next morning [Telxon's attorney] walked into the office, I can't remember what container his files were in, but they were compiled together in the file. And I took that into the jury room and I asked both sides, `Is this all of the evidence?'
Both [sides] answered yes."
This account was not disputed by either party. Moreover, it is undisputed that Telxon did not submit any unadmitted exhibits in the package which they presented to the bailiff — inadvertently, accidentally, or otherwise. We do not find it unreasonable that Telxon relied on the good faith of SMI's and Dupre's attorneys, as officers of the court, to accurately submit only the exhibits the two parties had reviewed, discussed and agreed upon. Thus, we find no merit in SMI's contention that Telxon was obligated to police these exhibits further and should be so penalized for failing to do so.
 {¶ 26} In his separate response brief, Mr. Dupre contends that the jury's receipt of the unadmitted exhibits does not warrant a new trial because Telxon failed to prove prejudice. Mr. Dupre insists that there is no presumption of prejudice under these circumstances, citing State v.Cooper (1977), 52 Ohio St.2d 163, vacated in part by Cooper v. Ohio
(1978), 438 U.S. 911, 57 L.Ed.2d 1157, and insists that this remains the law in Ohio as the U.S. Supreme Court did not address this issue in partially vacating the opinion. We note that the Ohio Supreme Court addressed this aspect of its 22-issue, 19-page opinion in a mere 140 words, succinctly concluding that "the error of the trial court in not formally admitting the above exhibits in evidence was harmless, since all these exhibits were merely cumulative in nature." Cooper,52 Ohio St.2d at 180. Thus, it could be inferred that there was so much other, overwhelming evidence of Cooper's guilt in that case that even if there were a presumption of prejudice from the submission of this unadmitted evidence, that the State overcame the presumption and proved the error harmless. Therefore, we do not find this terse ruling to represent the Ohio Supreme Court's definitive position on the presumption of prejudice whenever evidence is erroneously submitted to the jury room in Ohio courts. However, other courts have spoken regarding the respective burdens and the presumption of prejudice in closer cases:
"Where extraneous information is imparted, as when papers bearing on the facts get into the jury room without having been admitted as exhibits, or when a juror looks things up in a dictionary or directory, the burden is generally on the party opposing a new trial to demonstrate the absence of prejudice, and a new trial is ordinarily granted if there is a reasonable possibility that the material could have affected the verdict." Sea Hawk Seafoods v. Alyeska Pipeline Serv. Co. (C.A.9, 2000),206 F.3d 900, 906.
Furthermore:
"It is not for the court to say whether there was sufficient evidence adduced at the trial to justify the finding of the jury, and that the evidence improperly received by them could have had no influence on the verdict. This is purely a matter of fact and not within the province of the court to determine, for the law has no criterion by which to know or ascertain the effect which the improper evidence may produce upon the verdict. When improper evidence, that may have prejudiced the case, has been received by the jury, the law will so presume." Stiles,211 F.2d at 190.
We find these cases to embody the better reasoned view, and therefore we conclude that Mr. Dupre's argument is without merit.
 {¶ 27} To the extent that improper evidence was submitted to the jury and such evidence significantly prejudiced Telxon's right to a fair trial, we find that the trial court abused its discretion in finding otherwise. Telxon's first assignment of error is sustained and a new trial is warranted.
 B. Telxon's Second Assignment of Error
"THE TRIAL COURT ERRED IN NOT GRANTING A DIRECTED VERDICT, A JUDGMENT NOTWITHSTANDING THE VERDICT (`JNOV'), OR, ALTERNATIVELY, A NEW TRIAL."
 {¶ 28} Telxon asserts that SMI and Mr. Dupre failed to satisfy each element of each counterclaim, as is required by law. That is, when the evidence presented does not satisfy every element, the claim at issue is insupportable and must be denied as a matter of law, either on directed verdict or judgment notwithstanding the verdict (JNOV). We agree, and will address each counterclaim in turn.
 {¶ 29} The decision to grant or deny a motion for directed verdict or judgment notwithstanding the verdict is reviewed de novo. Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4 (setting forth the standard); Osler v. Lorain (1986),28 Ohio St.3d 345, 347 (equating the judgment notwithstanding the verdict to the directed verdict). Directed verdict, or judgment notwithstanding the verdict, is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the non-moving party reasonable minds could come to but one conclusion, that being in favor of the moving party. Civ.R. 50(A)(4) and (B); Goodyear at ¶ 3. Such a decision does not determine factual issues, but only questions of law, even though it is necessary to review and consider the evidence in deciding the motion. Goodyear at ¶ 4. "Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions." Osler,28 Ohio St.3d at 347.
 {¶ 30} SMI responds that this issue was never raised before the trial court, that it was not specified in a motion for directed verdict, and is therefore waived for purpose of appeal. This argument is totally without merit as this embodies the very issue that was before the court in Telxon's claim and its defense against SMI's counterclaim. Furthermore, the record reflects that Telxon did move for, and repeat its motion for, directed verdict charging a deficiency as to every count of SMI's and Dupre's counterclaim. SMI's reliance on the trial court's interruptions and admonitions in overruling these motions is misplaced and cannot support a finding that Telxon waived this issue for purpose of the present appeal.
 {¶ 31} SMI also argues that the evidence supported the jury's finding that Telxon made certain promises and oral agreements with SMI. However, the jury's finding is overcome if there exists no legal basis for the claim — such is the precise purpose of directed verdict or JNOV. Civ.R. 50(A)(4) (B); Goodyear at ¶¶ 3-4.
 {¶ 32} Based on the forgoing, we consider Telxon's challenge to each of SMI's and Dupre's counterclaims, and in so doing accept SMI's and Dupre's version of the evidence to determine: (1) whether that evidence satisfies the applicable legal standard; or (2) whether reasonable minds would necessarily find for Telxon, even based upon SMI and Dupre's version of the events in question.
1. Negligent Misrepresentation, Intentional Misrepresentation, and Fraud Claims — both SMI and Mr. Dupre.
 {¶ 33} All of these tort-based counterclaims are insupportable as a matter of law, based on the premise by which they were asserted. Each of these causes of action requires a common element: misrepresentation of material fact. Delman v. Cleveland Heights (1989), 41 Ohio St.3d 1, 4
(negligent misrepresentation); Carpenter v. Scherer-Mountain Ins. Agency
(1999), 135 Ohio App.3d 316, 327 (intentional misrepresentation);Gaines v. Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55 (fraud). This means past or existing facts, not promises or representations relating to future actions or conduct. Williams v. Edwards (1998),129 Ohio App.3d 116, 124.[10] On the other hand, "[a] contract is a promise — and a promise necessarily implicates future conduct." Cincinnatiex rel. Ritter v. Cincinnati Reds, LLC, 150 Ohio App.3d 728,2002-Ohio-7078, at ¶ 46.
 {¶ 34} Accordingly, "[i]n Ohio, a breach of contract does not create a tort claim." Textron Financial Corp. v. Nationwide Mut. Ins. Co. (1996),115 Ohio App.3d 137, 151. See, also, Bullet Trucking, Inc. v. GlenFalls Ins. Co. (1992), 84 Ohio App.3d 327, 333 ("[I]t is no tort to breach a contract."); Gervace v. Master Foods, Inc. (Oct. 12, 1978), 8th Dist. No. 37643, at *13 ("An unfulfilled promise to do something in the future gives rise to an action for breach of contract, not a fraudulent misrepresentation.").
"A tort claim based upon the same actions [as] those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." Textron, 115 Ohio App.3d at 151.
To hold otherwise would be to convert every unfulfilled contractual promise, i.e., every alleged breach of a contract, into a tort claim. See id.
 {¶ 35} In the present case, the "misrepresentations" alleged by SMI or Dupre under these tort claims were based on Telxon's failure to fulfill the alleged promises to invest money: the $3 million allegedly promised in exchange for 10% of SMI, and the $730,000 allegedly promised to SMI to develop the prototype. These claims, as stated at trial, were framed as:
"Smart Media/Bill Dupre allege that Telxon [negligently or intentionally] supplied false and misleading information regarding its intention to fund, manufacture, co-market, distribute and act as field service provider of the SmartHandle projects."
Compare this with the breach of contract claim, as stated at trial:
"Smart Media, Bill Dupre allege that Telxon agreed to fund, manufacture, co-market, distribute and act on field, as field service provider of the SmartHandle project."[11]
Therefore, by their own terms, SMI and Dupre based their tort claims on the identical actions or conduct from which they claimed breach of contract: Telxon's alleged promise or agreement to commit money to the venture. The jury awarded $3.73 million to SMI on its negligent misrepresentation counterclaim.[12] Yet, as a matter of law Telxon committed no actionable misrepresentation.
 {¶ 36} It is worth noting, however, that this case is rife with misrepresentation, albeit on the part of SMI. For example, every member of SMI's management, including interested shareholders and legal counsel, testified that they would never have consented to any partnership with Symbol, but that their negotiations with Symbol were revealed (misrepresented) to Telxon as a sham to spur Telxon into action. See Carpenter, 135 Ohio App.3d at 327 (intentional misrepresentation). Also, on October 30, 1996, SMI sent a letter to Telxon designating Bob McCann as SMI's impending President and CEO, but during trial, SMI and Dupre insisted repeatedly that at that same time SMI presented McCann to Telxon as representing the outside advertisers ready and willing to commit capital to this project. Obviously, he could not be both an SMI principal and outside customer — one or the other is a misstatement. See Delman, 41 Ohio St.3d at 4 (negligent misrepresentation). This leads to the allegorical elephant in the living room, the misrepresentation which was so inexplicably overlooked in this case: SMI's false assertion that it had advertisers committed to contributing the up-front capital necessary to fund the product rollout, the aspect of SMI's plan that made the otherwise prohibitively expensive device affordable to the grocery stores, and made the project enticing to Telxon. After the fact, SMI candidly admits that it had no such committed advertisers. See Gaines, 33 Ohio St.3d at 55 (fraud).
 {¶ 37} However, while this conduct by SMI is noteworthy, particularly as it relates to the equitable claims discussed below, we recognize that Telxon did not sue SMI on such claims and we are not reviewing them for that purpose now. Rather, we offer them as examples of the types of misstatement of fact that would appear to support a tort claim, in contrast to Telxon's alleged promise merely to fulfill a contract condition.
 {¶ 38} In conclusion, because the premise underlying SMI's and Dupre's tort claims was the alleged failure to fulfill a contractual promise, and not any material misstatement of fact, we find these claims insupportable as a matter of law and that a directed verdict was warranted. SeeTextron, 115 Ohio App.3d at 151; Bullet Trucking,84 Ohio App.3d at 333; Gervace, at *13. Telxon's assignment of error regarding these counterclaims is sustained.
2. SMI's Breach of Contract Claim.
 {¶ 39} Telxon alleges that the trial court erred by failing to find, as a matter of law, that no contract had arisen between Telxon and SMI, because the indisputable documentary evidence proved that there had been no meeting of the minds on any proposed transaction. The jury found that Telxon had agreed to invest $3.73 million in SMI's start-up venture and that Telxon's delay breached the agreement and prevented SMI from timely bringing Smart Handle to market, which caused SMI significant monetary damages. However, Telxon contends that negotiations never reached the stage of an actual agreement, and without such, there was no binding contract and no legal basis for finding a breach of contract. We agree.
 {¶ 40} "Courts generally determine the existence of a contract as a matter of law." Applegate v. Northwest Title Co., 10th Dist. No. 03AP-855, 2004-Ohio-1465, at ¶ 9, citing Latina v. Woodpath Dev. Co.
(1991), 57 Ohio St.3d 212, 214.[13] Fundamental to valid contract formation is that the parties must evince a meeting of the minds; that is, valid offer and acceptance such that a reasonable person would find that the parties manifested a present intention to be bound to an agreement. 17 Ohio Jurisprudence 3d (2003), Contracts, Sections 15, 16, 18, 24. We also note that the "[t]erms of an oral contract may be determined from words, deeds, acts, and silence of the parties." (Internal quotations omitted.) Kostelnik v. Helper, 96 Ohio St.3d 1,2002-Ohio-2985, at ¶ 15. This directs us to conduct a complete inquiry of the events and communications surrounding the alleged agreement(s), and thereafter render a decision on the formation of a contract as a matter of law. As stated above, evidence will be construed most favorably toward SMI and Mr. Dupre, the non-moving parties.
 {¶ 41} Notably, not every agreement is a contract. See 17 Ohio Jurisprudence 3d, Contracts, Section 1.
"A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration. A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract.
"* * * However, all agreements have some degree of indefiniteness and some degree of uncertainty. In spite of its defects, language renders a practical service. In spite of ignorance as to the language they speak and write, with resulting error and misunderstanding, people must be held to the promises they make." (Internal citations and quotations omitted.)Kostelnik at ¶¶ 16-17.
Yet, it is worth repeating: "to declare the existence of a contract, the parties to the contract must consent to its terms, there must be a meeting of the minds of both parties, and the contract must be definite and certain." Purdin v. Hitchcock (Jan. 21, 1993), 4th Dist. No. CA 531, at *8, citing Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus.Relations (1991), 61 Ohio St.3d 366, 369.
 {¶ 42} Often, as in the present case, questions arise as to when mere negotiations ripen into an enforceable contract:
"That an offer is distinguished from preliminary negotiations is a fact well recognized in the law of contracts. * * * `Frequently negotiations for a contract are begun between parties by general expressions of willingness to enter into a bargain upon stated terms and yet the natural construction of the words and conduct of the parties is that they are inviting offers, or suggesting the terms of a possible future bargain, [rather] than making positive offers.'" Cohen v. Johnson (M.D.Pa., 1950), 91 F.Supp. 231, 235, quoting Williston on Contracts (Revised Ed.) vol. 1, Sec. 27.
Judge Easterbrook of the U.S. Court of Appeals for the Seventh Circuit has articulated the important policy behind this distinction in defending the objective approach to analyzing contract formation:
"The objective approach is an essential ingredient to allowing the parties jointly to control the effect of their [contract]. If unilateral or secret intents could bind, [then] parties would become wary, and the written word would lose some of its power. The ability to fix the consequences with certainty is especially important in commercial transactions that are planned with care in advance. A merger or the acquisition of assets will create many potential difficulties, and the parties should be able to choose with precision the point at which they can no longer back out. * * * A rule of law that could bind the parties to a deal in the midst of resolving these uncertainties — perhaps worst of all, inject the random element of a jury's determination about subjective intent — would make transactions riskier. Some beneficial transactions would be forgone. Others would become more cumbersome, as the parties refused to commit intermediate steps to paper or inserted elaborate disclaimers. The commercial practice of describing intermediate steps as `agreements in principle' or `letters of intent' — and distinguishing these from binding `formal agreements' — makes complex transactions easier to plan and ultimately works to the advantage of all concerned.
"As a rule, `agreements in principle' that refer to subsequent `formal agreements' are not binding. Even Professor Corbin, one of the great exponents of the subjective approach to intent, took this view. `One of the most common illustrations of preliminary negotiation that is totally inoperative is one where the parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes this document.' 1 Arthur Linton Corbin, Contracts § 30 at 97 (1963)."Skycom Corp. v. Telstar Corp. (C.A.7, 1987), 813 F.2d 810, 815.
Thereafter followed an example which is peculiarly on point with the present case:
"Perhaps the best modern example of this principle is Reprosystem,B.V. v. SCM Corp. [(C.A.2, 1984), 727 F.2d 257, 258-63]. Reprosystem and SCM negotiated for months about the sale of SCM's foreign subsidiaries to Reprosystem. They hammered out the details of an agreement with great care. They produced a document designated an `agreement in principle.' The `agreement in principle' was definitive, containing all of the terms. The parties shook hands and exchanged congratulations. SCM then issued a press release announcing the `agreement in principle.' SCM later reviewed the operations of the subsidiaries, concluded that they were more profitable than it had thought at the time of the negotiations, and refused to sign the formal agreement. After a full trial the district court concluded that the parties subjectively intended to be bound by the agreement in principle. The Second Circuit reversed, holding that as a matter of law a negotiation looking toward a definitive contract leaves the parties unbound until the closing. The parties negotiated toward a formal contract and did not reach it; that the contract fell through only because one party got cold feet or wanted to renegotiate was unimportant, because that is simply the definition of not (yet) being bound. Insistence on a complete deal, the court pointed out, reflects the `practical business need to record all the parties' commitments in definitive documents.' Reprosystem was decided under New York law. Wisconsin law, which does not enforce `agreements to agree,' must come out the same way." (Internal citations omitted.) Id. at 815-16.
In Ohio, such agreements to agree "are enforceable when the parties have manifested an intention to be bound by their terms and when these intentions are sufficiently definite to be specifically enforced."Oglebay Norton Co. v. Armco, Inc. (1990), 52 Ohio St.3d 232, 236. See, also, Berjian v. Ohio Bell Tel. Co. (1978), 54 Ohio St. 2d 147, 151. Therefore, overall, we consider whether the parties manifested a sufficiently definite intention to be bound such that an agreement would be specifically enforceable, or whether they merely negotiated toward a formal contract without ever reaching it.
 {¶ 43} SMI and Dupre claim that enforceable verbal contracts arose at two particular points during their year-long negotiations with Telxon: once at the July 9, 1996 meeting in Akron, and then again at the October 24, 1996 meeting in New York. Based on the foregoing, we consider these two interactions, granting all factual disputes and credibility determinations to SMI/Dupre, to determine if the legal elements for an enforceable verbal contract were satisfied. We find that they were not. Also, we note that for the purpose of this analysis, we need only consider these two particular interactions. In the next section, regarding the promissory estoppel claim, we review the continuum of interactions between the parties, from March 1996 and March 1997, for totality in context.
 {¶ 44} The first meeting was held in Akron, Ohio, on July 9, 1996. Dennis Blaeuer, Bill Dupre and Jack Gerstein attended for SMI. Telxon executives included Jim Traxler, David Swank, and Dan Wall. SMI's participants testified to an oral agreement between the parties, in which Telxon agreed to invest $3 million for a 10% stake in SMI (with an option to acquire another 9.4% for another $3 million), Telxon agreed to develop the Smart Handle prototype, and Telxon agreed to pay for the rollout of the Smart Handle product. Telxon's witnesses denied that any contract was formed. But, even taking SMI's testimony as true (or more credible), we observe certain obstacles to the formation of an enforceable contract.
 {¶ 45} Regarding the specificity needed to create a valid oral contract, it was undisputed that the cost to develop the prototype had not yet been determined, even though this was a foreseeable expense. By contrast, the prohibitive expense was the rollout cost — which Telxon was anticipating would be funded by advertisers in accordance with SMI's originally proffered business plan. Indeed, this was the general premise on which Telxon entered negotiations with SMI, as emphasized time and again by Telxon, such as in Jim Traxler's letter to Dennis Blaeuer to arrange this first meeting: "You have told me that the interest of certain national advertising agencies is very high, and that media money to fund the development and implementation of this concept is available." Dennis Blaeuer testified that even Telxon could not predict at that time how much the rollout costs would be and that such costs were never discussed at the meeting, yet he insisted that Telxon had volunteered to pay for those costs. This contradiction on the critical element of the negotiations refutes a manifestation of a present intent that would cause a reasonable person to find a meeting of the minds sufficient to sustain an enforceable oral contract. See Oglebay Norton Co., 52 Ohio St.3d at 236. See, also, Shampton v. Springboro, 98 Ohio St.3d 457, 2003-Ohio-1913, at ¶ 31.
 {¶ 46} Regarding the authority to enter a contract, Blaeuer testified that he knew Telxon's representatives lacked authority to bind Telxon under such a contract, but that they "did specifically tell us Bob Meyerson carried the weight of the board and had the ability to approve the deal." Indeed, SMI and Dupre repeated this argument throughout trial and emphasized it at closing: that Meyerson, the outgoing CEO, had the authority to make the deal, and that SMI and Dupre relied on that authority. Jack Gerstein similarly testified that it was very clear that Meyerson would have to approve the deal. This appears sufficient to refute the formation of an enforceable oral contract. See PiperAcceptance Corp. v. Tenex Corp. (Oct. 1, 1986), 1st Dist. No. C-850854, at *6 ("a person dealing with a known agent must acquaint himself with the extent of the agent's authority."). Suspiciously, SMI's internal legal counsel, Arthur Fillmore, testified that, generally, Blaeuer would need approval from his board of directors or principal shareholders before he could commit SMI to such a drastic endeavor — yet, SMI insists that it was unreasonable to expect that Telxon would need board approval.
 {¶ 47} Regarding the aspect of formal closing, SMI's Gerstein testified that both sides understood that no deal would be final until it had been reduced to writing for Meyerson's approval, which Telxon allegedly claimed would take 30 days. Blaeuer testified similarly: "This meeting ended by continuing to implement the joint effort * * * and we were shooting for August 12 for a closing of the financial part of the deal." This precludes the formation of an enforceable oral contract because, as stated above, "as a matter of law a negotiation looking toward a definitive contract leaves the parties unbound until the closing." Skycom Corp., 813 F.2d at 815, citing Reprosystem,727 F.2d at 261.
 {¶ 48} It is notable that following the meeting the parties exchanged numerous communications in which neither party expressed any indication that an enforceable agreement had been reached. For example, Telxon faxed a tentative term sheet to SMI. The cover page contained the statement: "please understand that this is not intended to be a formal proposal of the deal at this point, but rather a starting place for discussions." Similarly, after a period of delay, on August 21, 1996, SMI sent Telxon a proposed memorandum of understanding, which included: "Whereas, the Parties or their affiliates have engaged in preliminary discussions with a view toward forming an entity * * *." There was no mention of any enforceable contract, expectation of performance, or accusation of breach.
 {¶ 49} After further delay, on September 16, 1996, SMI sent a letter to Telxon, purportedly withdrawing from negotiations and expressing its intent to negotiate with Symbol, Telxon's principal competitor. This prompted the second meeting between SMI and Telxon, which was scheduled for October 24, 1996 in New York. Bob Meyerson, Frank Brick, Jim Traxler and David Swank attended for Telxon; Dennis Blaeuer, Bob McCann, Jack Gerstein, David Gershon and Emanuel Faust for SMI; and Bill Dupre attended via conference call. Blaeuer, Gerstein and Dupre testified that during this meeting Meyerson verbally committed Telxon to the same agreement: allegedly $3 million for 10%, plus $730,000 for prototype development. Each of Telxon's witnesses[14] testified that no oral contract arose from these discussions. McCann and Faust, SMI participants, had no recollection of any contract being formed, but could not refute it either. Apparently only Faust took notes, which conclude:
"Basic Terms 
"Telxon to invest up to $____ to cover development costs in accord. w/approved Budget
"Telxon to receive ____% of equity for funding Manufacturing Agmt. upon mutually agreeable terms"
As with the prior meeting, based on this unresolved ambiguity, these parties had not manifested an intention that would be "sufficiently definite to be specifically enforced." See Oglebay Norton Co.,52 Ohio St.3d at 236. Similarly, this once again leaves closing for another day, which precludes the formation of an enforceable agreement as a matter of law.
 {¶ 50} Regarding the agreement, Blaeuer testified that Meyerson was the one person with authority to make the deal on behalf of Telxon, that Meyerson dominated this meeting, and that Meyerson entered into an oral agreement with SMI. However, Blaeuer also testified that Meyerson said "I want you [SMI] to go see Frank Brick next week with your budget and just make sure if you need more money, you put it in there." Gerstein testified similarly. Based on an objective view of the evidence, even these enthusiastic negotiations, so long as made prior to closing, are as a matter of law insufficient to rise to the level of an enforceable contract. See Skycom Corp., 816 F.2d at 815-16, citing Reprosystem,727 F.2d at 262-63.
 {¶ 51} As had occurred after the July 9, 1996 meeting, the parties exchanged communications in which neither expressed any indication that an enforceable agreement had been reached. For example, on October 29, 1996, SMI sent a letter to Telxon which closed: "We are looking forward to a good discussion Friday and a profitable long-term partnership with Telxon." SMI also sent an agenda for the follow-up meeting, which stated:
"I. Discussion of the business of the proposed joint venture.
"II. Review Smart Media's draft `JV Investment Principal Terms' and attempt to reach agreement on the key terms of a joint venture.
"III. If possible, adopt a schedule for completion of deal documents and for closing."
As before, none of these statements do anything to suggest that any contract, agreement or enforceable promise arose from the prior meeting. A meeting was held in Akron on November 1, 1996, and attended by representatives of both sides, but neither side alleges that any agreements arose from this meeting.
 {¶ 52} In January 1997, negotiations essentially began anew between SMI and Pricer, Inc., a Telxon subsidiary, with Blaeuer submitting new proposals and conducting discussions with Pricer executives. By March 1997, Blaeuer and SMI had grown impatient. When Telxon, via Pricer, explained that it would be at least a couple of months before they could commit the requested capital, SMI decided to pursue other options. As Dupre testified: "At that point Dennis [Blaeuer] and I got together, spent some time and I think gave up. We couldn't possibly wait two or three months." By May 1997, SMI had entered an agreement with Fujitsu to develop the prototype and was pursuing additional capital. Thus, there is a certain stray aspect to this case: that if an enforceable contract did arise between SMI and Telxon, it was perhaps SMI that breached it. Although this is ultimately immaterial to our analysis of SMI's breach of contract claim, this possibility places the record evidence into context and enlightens an analysis of reasonableness, which is central to the equitable claims, infra. At this point it is worth reciting the elements for a breach of contract.
 {¶ 53} The elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant failed to fulfill his obligations, and (4) that damages resulted from this failure. Lawrence v. Lorain Cty. Community College
(1998), 127 Ohio App.3d 546, 548-49. That is, for the plaintiff to place the defendant in breach, the plaintiff must tender performance of his obligation and demand performance by the defendant of the reciprocal obligation. Restatement of the Law 2d, Contracts (1981), Section 238. Under the doctrine of constructive conditions, when performances can be rendered simultaneously, they are due simultaneously (unless the contract indicates otherwise). Id. at Sec. 234. However, when the performance of only one party requires a period of time, that party's performance is due at an earlier time than that of the other party, whose performance may be instantaneous (unless the contract indicates otherwise). Id. In the event of a condition precedent, the non-occurrence of that condition discharges the contractual duty to the extent that the condition cannot occur. Id. at Sec. 225. See Kaufman v. Byers, 11th Dist. No. 2003-G-2525,2004-Ohio-6346, at ¶ 30.
 {¶ 54} In the present case, SMI charges Telxon with three obligations: to invest $3 million for 10% of SMI; to pay $730,000 for development of the prototype; and to fund the rollout of the Smart Handle. The first is an example of performances that can be rendered simultaneously: Telxon's tender of cash for SMI's tender of ownership in the company. The second is an example of when performance by only one party requires a period of time: SMI's development of the prototype for Telxon's tender of cash. The third is an example of a non-occurring condition precedent; the failure to develop a prototype discharges any duty to fund the rollout of the product. All of this is to say that, in order for SMI to put Telxon in breach, SMI had to tender performance and demand performance from Telxon. According to all the available evidence, SMI never did so. From a reasonableness standpoint, this may be the most troubling aspect of this whole case — that SMI never demanded that Telxon perform this alleged promise. Therefore, SMI's claim is legally insufficient and directed verdict is appropriate.
 {¶ 55} In conclusion, we find as a matter of law that, under SMI's description of the events surrounding the alleged verbal agreements, there was no enforceable agreement. Foremost, we find that these mere negotiations, looking toward the rendition of a definitive contract, leave the parties unbound until the actual closing on that contract. SeeSkycom Corp., 813 F.2d at 815-16, citing Reprosystem, 727 F.2d at 262-63. This never happened. Furthermore, in Ohio, agreements must be sufficiently definite and specific. Oglebay Norton Co.,52 Ohio St.3d at 236. These alleged agreements were not so definite. Also, a representative must have authority, either actual or apparent, to bind his company to a contract. See, generally, Stuart v. Natl. Indemn.Co. (1982), 7 Ohio App.3d 63, 68. At the July 9, 1996 meeting, at least, no one from Telxon exhibited such authority. Finally, SMI never actually tendered performance so as to place Telxon in breach of the alleged agreement. Restatement of Contracts 2d., Sec. 238.
 {¶ 56} SMI argues that Telxon's basic premise is erroneous and unsupported by the record; that is, the jury did not award all of the damages solely for a breach of the promise to invest the $3.73 million, and therefore Telxon cannot show prejudice. SMI argues instead that the jury awarded these damages for Telxon's breach of the non-disclosure agreement.[15] As stated above, to make out a claim for breach of contract, the fourth element requires that the plaintiff prove damages.Lawrence, 127 Ohio App.3d at 549. Despite three weeks of trial, hundreds of exhibits and thousands of pages of testimony, the record does not contain one scintilla of evidence to document any damage resulting from the alleged breach of this non-disclosure agreement. That is, neither SMI nor Dupre introduced one iota of evidence upon which the finder of fact could conclude that either of them had actually been damaged by a breach of the non-disclosure agreement. Therefore, even if we were to find that Telxon breached this agreement, SMI's claim must fail as a matter of law. Telxon's assignment of error regarding this counterclaim is sustained.
3. SMI's Promissory Estoppel Claim.
 {¶ 57} Telxon alleges that the trial court erred by failing to direct the verdict or grant judgment notwithstanding the verdict in their favor on the promissory estoppel claim, arguing that the claim failed as a matter of law because no reasonable person could conclude that SMI met the elements of that claim. We agree.
 {¶ 58} "Promissory estoppel is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed." Stickler v. Keycorp, 8th Dist. No. 80727, 2003-Ohio-283, at ¶ 18. See, also, Karnes v. Doctors Hosp. (1990),51 Ohio St.3d 139, 142. That is, "[t]he doctrine of promissory estoppel aids the enforcement of promises by supplying the element of consideration when necessary to prevent injustice." Uebelacker v. CincomSys., Inc. (1988), 48 Ohio App.3d 268, 273. As an equitable concept, promissory estoppel is subject to equitable defenses, such as equitable estoppel, unclean hands and laches, and is also limited to equitable remedies. See, generally, Wooster v. Entertainment One, Inc.,158 Ohio App.3d 161, 2004-Ohio3-846. See, also, Ohio State Bd. ofPharmacy v. Frantz (1990), 51 Ohio St.3d 143, 145. However, we need not dwell upon these equitable defenses, limitations, substitutes for consideration or the prevention of injustice, because we find that SMI cannot meet the elements of the claim as a matter of law.
 {¶ 59} The elements of promissory estoppel are (1) a clear and unambiguous promise (2) upon which it would be reasonable and foreseeable to rely, and (3) actual reliance on the promise (4) to the detriment of the one who relied. Marusa v. Brunswick, 9th Dist. No. 04CA0038-M, 2005-Ohio-1135, at ¶ 39. While the making, keeping and relying upon of alleged promises are factual issues, typically for the jury, a court may deem certain circumstances objectively unreasonable, as when it finds that "reasonable minds could come to but one conclusion." Civ.R. 50(A)(4)(B). Reasonableness and foreseeability are objective factors. See Stickler at ¶ 26-27. Detriment must also be viewed objectively. Id. at ¶ 27. See, also, Cohen v. Cowles Media Co. (Minn. 1992),479 N.W.2d 387, 391 ("It is perhaps worth noting that the test is not whether the promise should be enforced to do justice, but whether enforcement is required to prevent an injustice.").
 {¶ 60} SMI claimed that as a result of the July 9, 1996 negotiations, Telxon made certain promises to perform their part of the intended agreement: to invest $3 million in SMI; to pay $730,000 to develop a Smart Handle prototype; and to pay for the rollout of the product to market. SMI also claims that it relied on these promises to its detriment, by hiring additional employees, renting additional space, and increasing business capabilities. Notably, no documentation whatsoever of the costs associated with these activities was ever introduced into evidence. Alternatively, in closing argument, SMI framed the promissory estoppel claim as follows:
"My people [SMI] did not go back to Symbol based upon that setting up of this [October 24, 1996] meeting which followed this memo [the September 16, 1996 letter to Telxon, purportedly withdrawing from negotiations and expressing the intent to negotiate with Symbol]. So you've got the deal, which was the promise. You've got the detrimental reliance, which means we're not going to go to a competitor, we're going to forbear going out to market and finding other partners; and you've got the damages we'll talk about in a few minutes." Taking SMI's viewpoint, that there was a promise upon which it relied, flaws arise from the ambiguity of the promise, the reasonableness of SMI's reliance, the foreseeability by Telxon that SMI would so rely, and the causal detriment.
 {¶ 61} As explained in the previous section, a party's eagerness to conclude negotiations, no matter how enthusiastic, does not necessarily connote an offer, acceptance or consideration sufficient to manifest the meeting of the minds necessary to give rise to an enforceable contract. See Skycom Corp., 813 F.2d at 815-16, citing Reprosystem,727 F.2d at 262-63. But, under promissory estoppel, such enthusiastic negotiations may ripen into an enforceable promise as a theory in equity. In this analysis, we must consider the negotiations from the larger perspective, beyond the two isolated meetings, with a focus on the reasonableness, foreseeability or detriment of the reliance. See Marusa
at ¶ 39.
 {¶ 62} At the outset of this discussion, it is worth recognizing the parties' relative perspectives during these negotiations. SMI was a group of ambitious entrepreneurs, essentially working out of a garage. Other than the Smart Handle concept, they had little more than a phone number and a mailing address. All of their time and attention was committed to these negotiations and the promotion of Smart Handle. On the other hand, Telxon was a successful corporate enterprise, constantly presented with technology-based investment opportunities in the form of start-up companies with appealing opportunities. While SMI had only Smart Handle, Telxon was considering hundreds of ideas, devices and potential investments. While SMI was infatuated with Telxon as the perfect partner, Telxon saw SMI as merely one suitor among many, all vying to be the next big thing.
 {¶ 63} At the beginning, in January 1996, Dennis Blaeuer, the principal founder of SMI, was looking for a corporate partner to develop the project. A meeting was arranged with Jim Traxler, a marketing executive with Telxon. By all accounts, Traxler was smitten with the Smart Handle idea, and the two met several times over the next few months. On June 27, 1996, Traxler sent Blaeuer a letter to encourage further negotiations, and also to articulate a certain foreboding:
"You have told me that the interest of certain national advertising agencies is very high, and that media money to fund the development and implementation of this concept is available. * * *
"* * * While we only need a couple of [grocery store] chains to commit * * *, I am skeptical that we can expect a broad-based rollout of self-scanning to most of the major chains on this [anticipated revenue] basis, because of the huge capital investment required to implement the system.
"Your concept [of having advertisers fund the product development and rollout] opens the possibility that such a broad-based rollout could take place, because the capital investment can be subsidized by media payments in some form. Since our primary interest is in marketing wireless systems to retailers, your concept potentially expands our marketplace exponentially.
"Any concept that could have that effect on our revenue is almost certain to be regarded, at first glance, as `too good to be true.' While you have slowly made a believer out of me up to this point, it is time to involve the senior executives at Telxon who are responsible for the advanced product RD and the usually-associated investment opportunities. * * * If we decide to proceed further, [David] Swank would become the key contact for you and your partners.
"* * *
"* * * While I speak for Telxon Retail Strategy, I do not speak for Telxon corporate strategy, and it is now up to you to convince those with the strategic purse strings [in] the company of the viability of your business case."
As evident from this letter, this July 9, 1996 introductory meeting was intended as the possible commencement of negotiations. As SMI was well aware, Traxler did not have authority to commit Telxon to the project and held little persuasive power over the other Telxon executives. Moreover, SMI was aware that no one attending for Telxon had authority to commit Telxon to the proposed deal. Yet, according to SMI's claim, these Telxon executives made verbal promises to invest $3 million for a 10% stake in SMI (with an option to acquire another 9.4% for another $3 million), to develop the prototype, and to pay for the rollout. Furthermore, SMI claims to have reasonably relied on these promises to its detriment.
 {¶ 64} If the alleged promisor has no authority to make the promise, and the promisee knows or should know of that lack of authority, then promissory estoppel must fail as a matter of law. Bohach v. Advery, 7th Dist. No. 00 CA 265, 2002-Ohio-3202, ¶ 18, 19, 29. Simply put, such reliance cannot be reasonable. As demonstrated above, supra ¶ 46, it is undisputed that Bob Meyerson was not present to provide any promise, and regardless of the truth, SMI believed that Meyerson was the solitary individual with authority to bind Telxon to such a promise or agreement. Therefore, even if promises were made at this meeting, a promissory estoppel claim must fail as a matter of law. See Bohach at ¶ 29. Furthermore, SMI offered no proof that such reliance was foreseeable by Telxon. To the contrary, all the evidence suggests that Telxon would have been deterred from believing the July 9, 1996 meeting to be anything more than preliminary introductions and negotiations, as the following rendition of facts attests.
 {¶ 65} SMI attendees testified that no deal would be final until it had been reduced to writing, and that they would shoot for an August 12, 1996 closing date. Following the meeting, Telxon faxed a tentative term sheet to SMI. The cover page contained the statement: "please understand that this is not intended to be a formal proposal of the deal at this point, but rather a starting place for discussions." As to the substance of this term sheet, the final page states:
"13. [SMI] understands that Telxon will not be under any obligation to provide any financial support other than the funds expressed in a final agreement.
"14. These transactions require Telxon and [SMI] board approval (will actually be approved before funds transfer).
"* * *
"THIS TERM SHEET IS PREPARED IN ORDER TO FACILITATE DISCUSSIONS BETWEEN THE TWO PARTIES, IS NONBINDING UNTIL SUCH TIME SHOULD A DEFINITIVE AGREEMENT BE REACHED, AND IS NOT IN ANY WAY TO BE CONSTRUED AS AN OFFER TO PURCHASE SECURITIES OF OR MAKE ANY LOAN TO [SMI]." (Emphasis/capitalization in original)
SMI does not dispute the authenticity of this fax. Furthermore, SMI did not respond in protest that Telxon had already made a promise, that it (SMI) had detrimentally relied on that promise, or that anything other than further discussions would be forthcoming. Rather, they continued to negotiate.
 {¶ 66} After a period of delay, on August 21, 1996, SMI sent Telxon a proposed memorandum of understanding, signed by Dennis Blaeuer as president of SMI, but explaining "that given the time sensitivity of this matter, Mr. Blaeuer has executed the Memorandum. * * * However, should you have questions or comments * * * we will be happy to address them." This memorandum outlined the basic agreement that SMI desired to enter with Telxon, including everything discussed in the July 9, 1996 meeting. Within the memorandum, SMI asserted: "Whereas, the Parties or their affiliates have engaged in preliminary discussions with a view toward forming an entity * * *." Also: "[This] Agreement constitutes the entire agreement of the Parties with respect to SmartHandle and the Company." The final page was an attached spreadsheet titled "Smart Handle Product Development Costs" and tabulated to total $730,000. While this appears to be the origin of the $730,000 number later claimed by SMI, this document not only fails to prove the existence of a prior contract, it is documentary evidence disproving any prior agreement. Telxon never signed this memorandum. Moreover, this memorandum refers to preliminary discussions and proposed costs — nowhere does it assert a promise by Telxon, reliance on any promise, or harm arising from Telxon's delayed response.
 {¶ 67} After further delay, on September 16, 1996, SMI sent a letter to Telxon, purportedly withdrawing from negotiations and expressing its intent to negotiate with Symbol, Telxon's principal competitor. As explained previously, SMI's officers testified consistently that they never had an actual interest in a partnership with Symbol, but that this was a ruse to provoke Telxon to action. However, it is once again notable that, rather than spurring Telxon forward by demanding performance of the alleged enforceable promises arising from the July 9, 1996 meeting, SMI took this odd, reverse-psychology approach:
"On behalf of Dennis Blaeuer, Retail Media, Smart Media and the SmartHandle group (collectively `Blaeuer/Smart Handle'), I am writing, with some regret, to inform you that Blaeuer/Smart Handle has decided to pursue discussions with Symbol Technologies concerning a joint venture involving the Smart Handle product. Therefore, Blaeuer/Smart Handle hereby rescinds all outstanding proposals including the proposal transmitted by letter of August 21, 1996. * * *
"* * * Blaeuer/Smart Handle needs a venture partner who is prepared to act now to provide the cash infusion they need to operate and to commence and complete design and production of prototype units.
"* * *
"Though it appears that we will not be able to consummate a deal, and though I will admit to frustrations in attempting to close this matter with Telxon, I want you to know that Dennis, I, and the others are left with nothing but positive feelings for the people at Telxon. Perhaps our deal with Telxon was just never meant to be. We thank you for your efforts."
It would indeed be odd that this letter would "rescind all outstanding proposals," if there were actually promises already in place and being relied upon, as SMI later alleged. It would be odder still that SMI would be seeking another to "provide the cash infusion they need to operate and to commence and complete design and production of prototype units," if Telxon had actually already promised to pay for the design and production of the prototype. The oddest facet of this letter though, if there was indeed a contract or enforceable promise from the prior meeting, is the statement that SMI felt that "we will not be able to consummate a deal" and "our deal with Telxon was just never meant to be." At this point, any alleged reliance by SMI becomes patently unreasonable, just as any foreseeability of reliance by Telxon has wholly evaporated. See Spencev. Maiorca, 7th Dist. No. 01APO762, 2002-Ohio-5183, at ¶ 24; Stickler at ¶ 26-27. Similarly, this admission that SMI was simultaneously negotiating with others, including Symbol and Fujitsu, throughout the negotiations with Telxon, disproves any claim of foreseeable detriment and in this instance particularly disproves any detrimental reliance on promises by Telxon. See Karnes, 51 Ohio St.3d at 142.
 {¶ 68} Yet, the letter appears to have been effective; it prompted Telxon to another meeting. In a memo dated that same day, David Swank alerted Telxon's outgoing CEO Bob Myerson that they might revive the project if they acted quickly. On October 8, 1996, Jim Traxler sent an internal memo to Telxon's incoming CEO Frank Brick to introduce him to the Smart Handle situation, summarizing "the most important difference [between this and prior failed attempts] is that this startup company, SmartMedia, has had the foresight to line up the advertisers in advance, as opposed [to] going to the retailers to get to the manufacturers." The memo also states that Dupre is "already on board" and McCann is the "probable CEO of [the] new company." Thus, Telxon was spurred into action and a meeting was scheduled in New York for October 24, 1996.
 {¶ 69} Meanwhile, at SMI, Bill Dupre was sending internal confidential memoranda to Dennis Blaeuer. On September 30, 1996, Dupre sent a memo regarding Symbol, in which he referred to Symbol getting "60 day negotiating period (stop Smart Media negotiations with Telxon and potentially put Telxon out of self-scanning)." The next day, October 1, 1996, Dupre sent Blaeuer a memo regarding Telxon that began: "Below I have outlined a few options to be considered [in] structuring our agreement with Telxon." These options were entirely new to this series of negotiations. This memo recommended seeking a $200,000 upfront investment, an additional $800,000 over the next nine months, and a total project development cost of $1,500,000. These were entirely new numbers, which had never been suggested before. This new approach also omitted any reference to any prior agreement or the $730,000 prototype-development number. The memo suggested two options by which Telxon might purchase some share of SMI, though neither referenced the previous$3-million-for-10-percent. These two memos demonstrate conclusively that neither SMI nor Dupre were relying on any prior "clear and unambiguous promise" by Telxon. See Marusa at ¶ 39. Moreover, this indicates that reliance was not even foreseeable to SMI, let alone Telxon.
 {¶ 70} According to SMI, subsequent promises occurred at the meeting in New York on October 24, 1996. SMI claims that during this meeting, Meyerson made enforceable promises (the same $3 million for 10%, plus $730,000 for prototype development). However, at this stage of back-and-forth negotiations, it is highly questionable whether any
promises by Telxon could reasonably induce reliance by SMI (when SMI was offering novel and alternative options); whether any promises by Telxon could foreseeably result in detrimental reliance (after SMI's surprise notification that they were actively shopping the Smart Handle concept to others such as Symbol); and whether any such reliance at this stage could be detrimental. See Marusa at ¶ 39. Notably, even according to SMI, Meyerson did not conclude the deal right there; Blaeuer testified that Meyerson said "I want you [SMI] to go see Frank Brick next week with your budget and just make sure if you need more money, you put it in there." Gerstein testified similarly.
 {¶ 71} On October 29, 1996, SMI sent a letter to Telxon which began: "As we agreed in New York last Thursday [October 24, 1996], we are sending information relating to the joint venture for your review prior to our meeting on this Friday, November 1, 1996." The letter closes: "We are looking forward to a good discussion Friday and a profitable long-term partnership with Telxon." Appended to the letter was a final version of the investment term sheet. As with the prior correspondence, there is no mention of any enforceable promise, no demand to perform, no explanation that SMI has acted or relied to its detriment. This is merely acknowledgement that SMI intended that negotiations would continue.
 {¶ 72} The parties met again on November 1, 1996, in Akron. Neither side alleges that any new promises or agreements arose from this meeting. Significantly, Frank Brick refused to commit to the venture until Bill Dupre of SMI and Jim Traxler of Telxon had conducted a joint road show for various grocery store executives, so that they could get feedback on the Smart Handle concept. Following the meeting, Dupre sent an internal SMI memo to Blaeuer dated Nobember 4, 1996, stating:
"My initial reaction to the meeting last Friday [November 1, 1996] is very positive. I am not sure they [Telxon] did as much negotiating as others [may] have assumed. * * *
"* * *
"Recommendations:
"I think they want to proceed with us on this project. Stand firm on the $198,000 number when you speak with Brick. I think he is willing to pay that amount to get a GOOD LOOK at this whole thing. Please don't let the Lawyers hold this up." (Emphasis in original.)
Once again, this belies the existence of any outstanding promises by Telxon. Then, on November 11, 1996, Blaeuer sent two letters to Brick at Telxon. The first one stated:
"I know you are busier than the proverbial one-arm paperhanger; as we have been unable to connect since our meeting, I have taken the liberty to prepare the attached document. I trust this document reflects the terms necessary for us to proceed with what we both believe is a good piece of business."
The second letter began:
"As discussed in our meeting on November 1 in Akron, Telxon Corporation (`Telxon') and Smart Media of Delaware, Inc. (`Smart Media') will work together for the next sixty days to address several specific areas of concern prior to Telxon entering a joint venture arrangement with Smart Media." Neither letter suggests any reliance on any existing promise. On November 22, 1996, only a few days after completion of the Dupre-Traxler road shows, Traxler relayed to Brick a phone call from SMI: "Blaeuer related that they cannot wait any longer for us to respond and have initiated discussion with KKR [another potential investor] for a substantial equity investment." This similarly belies any detrimental reliance from this latest meeting.
 {¶ 73} In January 1997, negotiations essentially began anew between SMI and Pricer, Inc., a Telxon subsidiary, with Blaeuer submitting new proposals and conducting discussions with Pricer executives. By March 1997, Blaeuer and SMI had grown impatient. When Telxon, via Pricer, explained that it would be at least a couple of months before they could commit the requested capital, SMI decided to pursue other options. As Dupre testified: "At that point Dennis [Blaeuer] and I got together, spent some time and I think gave up. We couldn't possibly wait two or three months." By May 1997, SMI had entered an agreement with Fujitsu to develop the prototype and were pursuing additional capital.
 {¶ 74} On November 21, 1997, Blaeuer sent a letter to an investor that contained the following language:
"Frankly, since the last letter you received, we have gone through more than a little hell! However, the company and Smart Handle have emerged with a much stronger strategic alliance than it could have ever possibly had with Telxon Corporation.
"The good news is (there is not any bad news except for the delay), Fujitsu-ICL Retail Systems is signing an agreement with Smart Media, Inc. to manufacture, co-market, provide engineering, other technical assistance and integrated logistical support to Smart Handle customers in the field. * * *
"* * *
"* * * [On March 25, 1997, Telxon told SMI that they] had no senior technology staff or engineers to work on the Smart Handle project for 90 days. We were asked to delay the project for that period of time. This was the last straw; we told Telxon we could not, and would not. Looking back, it is clear that we worked too long with Telxon and should have gone elsewhere sooner; I personally take the blame for not doing so. * * *
"Ironically, except for the delay, this series of events has been beneficial to the project in spite of the frustration, personal difficulties and extra expense. * * * Fujitsu will make a much stronger strategic partner for Smart Media than Telxon could ever have; even if Fujitsu does not make a cash investment similar to the Telxon proposal, it is the better choice."
Notably, this timely recitation of SMI's state-of-mind refutes any later claim of these alleged promises, reliance thereon, or resulting detriment.
 {¶ 75} On whole, we conclude that reasonable minds could come to but one conclusion based on the evidence presented, even viewing that evidence most favorably to SMI. See Civ.R. 50(A)(4)(B). Based on the foregoing, SMI did not meet the elements of promissory estoppel, as a matter of law. See Marusa at ¶ 39; Bohach at ¶ 29; Spence at ¶ 24;Stickler at ¶ 27. Telxon's assignment of error regarding this counterclaim is sustained.
4. Mr. Dupre's Breach of Contract Claim.
 {¶ 76} Telxon asserts that the trial court erred by enforcing the jury verdict which awarded $681,000 to Bill Dupre for breach of contract. We agree. In the simplest sense, this claim fails under the same analysis as "SMI's Breach of Contract Claim," supra ¶¶ 39-56. In addition, even if a contract had arisen between Telxon and SMI, Dupre's claim must fail as a matter of law because Dupre was not individually a party to any supposed contract. It is fundamental to the law of contracts that "[a]n offer can be accepted only by a person whom it invites to furnish the consideration." Restatement of the Law 2d, Contracts (1981), Section 52. These parties never anticipated any Dupre-Telxon contract, Dupre never offered or accepted, and Dupre offered no consideration for some reciprocal consideration by Telxon. If Dupre entered a contract, it was with SMI, not Telxon.
 {¶ 77} Dupre's position is that there was sufficient evidence to establish Telxon's liability on the contract, and therefore, he should recover. At most, Dupre would have been an incidental third-party beneficiary to the purported SMIT-elxon agreement. An incidental third-party beneficiary has no rights to enforce the contract. BobbForest Prods., Inc. v. Morbark Indus., Inc., 151 Ohio App.3d 63,2002-Ohio-5370, at ¶ 59, citing Hill v. Sonitrol of S.W. Ohio (1988),36 Ohio St.3d 36, 40. Accordingly, he cannot recover on the contract. Telxon's assignment of error regarding this counterclaim is sustained.
5. Mr. Dupre's Promissory Estoppel Claim.
 {¶ 78} Telxon alleges that the trial court erred by failing to direct a verdict or grant judgment notwithstanding the verdict on Dupre's promissory estoppel claim, because no reasonable person could conclude that Dupre met the elements of that claim, and therefore, the claim failed as a matter of law. We agree.
 {¶ 79} As stated above, the elements of promissory estoppel are (1) a clear and unambiguous promise (2) upon which it would be reasonable and foreseeable to rely, and (3) actual reliance on the promise (4) to the detriment of the one who relied. Marusa at ¶ 39. In that we found no enforceable promise to SMI, supra ¶¶ 60-75, Dupre's claim would appear to fail as a matter of law under the same analysis (i.e., knowledge that alleged promisors lacked authority, unreasonableness, unforeseeability, absence of detriment). However, Dupre claims that Telxon made a specific promise to him, which he individually relied upon to his personal detriment. There was significant testimony about this issue.
 {¶ 80} On direct examination, Dennis Blaeuer, SMI's principal founder, testified to the hiring of Bill Dupre:
"[Dupre attorney]: Well, let's talk about my client, Mr. Dupre. Did Telxon ever request that Mr. Dupre be a part of this project?
"[Blaeuer]: Jim Traxler very specifically requested and said that, originally said it would be highly desirable and then I think he got right, downright, you know, aggressive about it and, of course, there was nothing contrary to my thinking. I was recruiting Bill Dupre, anyway, so he pretty much — he didn't make a condition present, per se. He said please hire him and told Bill [Dupre] that I think —
"[Telxon attorney]: Objection.
"[Blaeuer]: I don't know what he told Bill, I'm sorry. Anyway, yes."
Thereafter, Dupre testified on his own behalf, on direct examination:
"[Dupre]: Well, at the end of the [July 9, 1996] meeting, Jim Traxler — we were getting ready to stand up — said, `There's one more issue that we need to resolve.' And at that point he said, `We need to have you as part of this Smart Media deal. We need to have you — we're not going to do this without you. So we're going to, you know, you're going to have to leave Information Resources and come onto this thing full time.' And I told him that, `Based upon this commitment, I didn't have a problem with that.' I was very excited about it."
Dupre went on to testify that he agreed immediately to leave his position at IRI, and that he submitted his resignation within seven days of that decision. He testified about this interaction again on cross-examination:
"[Dupre]: Well, like I said yesterday, at the end of the [July 9, 1996] meeting, and I'm not sure who made this comment, whether it was Mr. Swank or Mr. Traxler, he said, `Oh, there is one more piece of business that we need to discuss,' and, you know, so we kind of waited to hear what this last piece was. And that's when Mr. Traxler informed me that, `Now that we have a deal, you are going to leave Information Resources and be part of this because we're not going to do this without you.' Or some words on that effect. It might not be the exact quotes."
Thus, Dupre claims that Telxon promised him that it would invest with SMI, which induced him to leave his job and salary at IRI for an unpaid position with SMI, and the failure to fulfill that promise caused him harm. On review, we find that Dupre did not meet any element of promissory estoppel, let alone all of them.
 {¶ 81} Regarding the promise itself, we find two flaws. The first was discussed earlier, that being the lack of authority by either Traxler or Swank to act on Telxon's behalf, which along with Dupre's knowledge that only Meyerson held that authority causes the claim to fail as a matter of law. See Bohach at ¶¶ 18, 19, 29. The second flaw regards the ambiguity of the alleged promise; that is, even as described by Blaeuer and Dupre, no clear and unambiguous promise was made directly to Dupre. At most, a promise was made to SMI, with the expectation that SMI would hire and compensate Dupre. These circumstances do not identify any benefit or promise flowing directly from Telxon to Dupre. Moreover, it seems worth noting that it is not even certain from Blaeuer's testimony that the perceived promise to SMI was absolutely contingent on Dupre. Thus a reasonable person would surely question the clarity and specificity of this promise. See id. at ¶ 21.
 {¶ 82} Regarding the reasonableness of Dupre's reliance, we find this no more reasonable than SMI's purported reliance discussed under "SMI's Promissory Estoppel Claim," supra ¶¶ 57-75. Dupre was intimately involved in the negotiations between SMI and Telxon, both before and after his resignation from IRI, and was privy to both the external and internal correspondences. Indeed, it was often Dupre who urged alternative proposals and offered bargaining strategy. Also, in accepting some percent ownership of SMI, in lieu of an actual salary, Dupre was well aware that his personal compensation would be dependant on SMI's success, regardless of Telxon's potential investment, and that there were significant risks involved. Dupre's compensation agreement was solely with SMI. Telxon had no input, or even the slightest concern, in how Dupre was compensated; by salary or ownership, or at what amount or percentage. This was a risk Dupre accepted in his agreement with SMI.
 {¶ 83} Regarding the foreseeability by Telxon that Dupre would rely on this alleged promise, even the versions presented by Blaeuer and Dupre cast the requirement in a future tense. That is, at most, Telxon expected that Dupre would join SMI full time as part of the impending deal. Dupre had been attending meetings with SMI and speaking on behalf of SMI up to that point, and there was no reason to foresee that things would change as negotiations continued. A reasonable person would not justifiably expect that a business savvy executive like Dupre would resign his job and $150,000 annual salary at IRI without taking any measures to protect his personal financial situation. Nor would Telxon have reason to foresee that it (Telxon) would be liable for paying Dupre to negotiate on behalf of SMI merely because SMI did not pay him. This is particularly apparent when one considers the lengths that Dupre and SMI took to convince Telxon that they had other ready and able investors, such as Symbol, and a willingness to partner with those other investors.
 {¶ 84} Regarding actual reliance, there is no dispute that Dupre quit IRI, but it is also undisputed that he continued to work as an independent consultant and did not actually begin formal employment with SMI until 1998:
"[Telxon attorney]: In this month of June, 1996, your employer was whom?
"[Dupre]: June of '96? Was Information Resources.
"[Telxon attorney]: When you first joined forces with Mr. Blaeuer after leaving Information Resources, you did not do so in the status of an employee, correct?
"[Dupre]: That's correct.
"[Telxon attorney]: You did so as an independent consultant, correct?
"[Dupre]: Yes.
"[Telxon attorney]: Okay. * * * You were actually in 1996 an employee of Smart Media, were you?
"[Dupre]: No.
"[Telxon attorney]: Nor in 1997?
"* * *
"[Dupre]: No, I was not an employee in 1997.
"[Telxon attorney]: So when [another SMI executive] testified that you got a W-2 for the first time in 1998 that comports with your experience and your memory, right?
"[Dupre]: Yes."
Furthermore, it is not verifiable from the evidence that Dupre relied on Telxon's statement at all, as he testified on direct examination:
"[Dupre attorney]: Now, let me take you back to the meeting with Dennis [Blaeuer of SMI] in 1995. What did he present to you specifically to induce you to work with him on this project?
"[Dupre]: As I talked about before, when he showed me the drawings and stuff, and talked about the kind of products, I thought he really had something very unique and I was prepared to commit some of my own personal time to this to help Dennis out.
"[Dupre attorney]: And were you prepared to do that without getting paid?
"[Dupre]: Yes. I do that quite frequently, there's probably three projects that I'm helping friends with right now that they're not paying me for.
"[Dupre attorney]: And is that part of what you do in a position you have?
"[Dupre]: Sure. You know, the retail technology side is very, very small. There's not many companies involved. You go to these trade shows, we all know each other. And so when someone calls up and asks for a favor, I would certainly be willing to help them out and then I know that if I call somebody up and ask them for a favor, they'd be more than willing to help.
"[Dupre attorney]: But when you make that phone call, does it concern you who is going to pay for it?
"[Dupre]: No.
"[Dupre attorney]: Does it make a difference to you where the phone is located when somebody picks it up?
"[Dupre]: No.
"[Dupre attorney]: Does it make a difference who is paying the postage on the envelope?
"[Dupre]: It doesn't make any difference. I'm helping a friend." Dupre also testified that he had resigned from IRI once before, and had just returned to discover that IRI was faltering financially. This evidence belies an assertion that Dupre reasonably and detrimentally relied on an alleged promise.
 {¶ 85} Finally, regarding the alleged detriment, we need only review what is stated above. By his own testimony, Dupre was not even expected to leave IRI until the deal had been consummated. Once he left, Dupre was engaged for the next two years as an independent contractor, not an SMI employee, and was virtually unrestricted in his ability to earn income. He did not assert that he refused any other opportunities due to an inducement from Telxon, merely that he quit IRI with an intent to eventually join SMI, at the behest of Telxon. However, up to that point he had apparently been unrestricted by his employment at IRI, as he routinely attended meetings, wrote memos, and negotiated on behalf of SMI. Finally, even his agreement with SMI was not for direct compensation, but rather, for an ownership interest in a high-risk, start-up enterprise — even with the Telxon investment, there was no assurance that Dupre would receive any money from SMI. To clarify this point, we note that a risk such as this was discussed at trial:
"[Telxon attorney]: Do the [start-up companies] that get funded always succeed?
"[Telxon Expert]: No. That's another interesting thing about starting businesses. I've been involved in the start-ups now for the majority of my career. It is very difficult to build a successful business. There's simply so many variables. Competition, financing, technology, the management team.
All kinds of things, and you really don't know in advance when you're thinking about funding when you start up a business whether or not they're going to be successful."
Thus, the evidence does not support a conclusion that Dupre actually acted to his detriment in reliance on any clear and unambiguous promise. See Tripp v. Beverly Ent.-Ohio, Inc., 9th Dist. No. 21506, 2003-Ohio-6821, at ¶ 46.
 {¶ 86} Based on these facts, as presented by Blaeuer and Dupre, we must conclude, as a matter of law, that these circumstances do not support a claim of promissory estoppel. Furthermore, we conclude that no reasonable person could draw such a conclusion in favor of Dupre based on these facts. Telxon's assignment of error regarding this counterclaim is sustained.
6. Mr. Dupre's Tortious Interference with a Business Relationship Claim.
 {¶ 87} Telxon alleges that the trial court erred by failing to direct a verdict or grant judgment notwithstanding the verdict on Dupre's tortious interference claim, because no reasonable person could conclude that Dupre met the elements of that claim, and therefore, the claim failed as a matter of law. We agree.
 {¶ 88} The elements of tortious interference with a business relationship are (1) a business relationship, (2) known to the tortfeasor, and (3) an act by the tortfeasor that adversely interferes with that relationship, (4) done without privilege and (5) resulting in harm. Brookeside Ambulance, Inc. v. Walker Ambulance Serv. (1996),112 Ohio App.3d 150, 155-56. Specifically, element three requires an act that "causes a third person not to enter into or continue a business relation with another." (Emphasis added.) AB-Abell Elevator Co., Inc.v. Columbus/Central Ohio Bldg. Constr. Trades Council (1995),73 Ohio St.3d 1, 14, 1995-Ohio-66. Also, this act must be done maliciously, "i.e., [with] knowledge of falsity or reckless disregard for the truth." Id. at 15. Finally, it is worth emphasizing element four, that the interference must be without privilege. See Fred Siegel Co., LPAv. Arter Hadden (1999), 85 Ohio St.3d 171, 176, 1999-Ohio-260.
 {¶ 89} In the present case, Dupre contends that Telxon induced him to quit his job at IRI, which consequently caused him financial harm. The flaws with this claim are obvious. Dupre's claim is predicated on his own, individual act of resigning from IRI to join SMI, not on some wrongfully induced act undertaken by a third party (i.e., IRI) over which the victim has no control. The present circumstance does not constitute the basis for a tortious interference with a business relation claim. See id. at 175-76 ("causing the third person not to perform"). See, also,Nelson v. Akron (Oct. 31, 1990), 9th Dist. No. 14605, at *8 ("It is axiomatic that one cannot tortiously interfere with his own contract."). If employees could sue under such a theory, then no employer could safely hire an employee away from another. The law does not promote such a policy.
 {¶ 90} Furthermore, there is no evidence that Telxon acted maliciously to harm Dupre's relationship with IRI, separate and apart from the intended benefit to the proposed Smart Handle venture. See Bryan v.Farrell (Dec. 16, 1998), 9th Dist. No 18973, at *9. Such competition for services is ordinarily privileged, and even encouraged, as representative of capitalism. See Reagan v. Ranger Transp. Inc. (Dec. 4, 1998), 11th Dist. No. 97-P-0102, at *19 (reasoning that competition in offering better benefits is not wrongful interference). Of course, had Telxon acted to induce IRI to rid itself of Dupre, this would be an altogether different case. But they did not.
 {¶ 91} We find that Dupre's claim of tortious interference with business relations fails as a matter of law. Telxon's assignment of error regarding this counterclaim is sustained. In summary, Telxon's entire second assignment of error is sustained. The trial court erred in failing to grant directed verdict or JNOV in favor of Telxon on each of the counter-claims alleged by SMI and Dupre.
 C. Telxon's Third Assignment of Error
"THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON AWARDS THAT (A) ARE SPECULATIVE AND REFLECT THE UNSUPPORTED HYPOTHESIS THAT $218 MILLION IN DAMAGES FLOWED FROM A DECISION NOT TO INVEST $3.7 MILLION IN A START-UP BUSINESS THAT NEVER MADE ANY MONEY EVEN AFTER LATER RECEIVING MORE THAN $8 MILLION FROM OTHER INVESTORS; (B) REST ON INADMISSIBLE EVIDENCE THAT DID NOT SATISFY APPLICABLE LEGAL STANDARDS; (C) ARE DUPLICATIVE AND OTHERWISE LEGALLY FLAWED; AND (D) ARE GROSSLY EXCESSIVE."
 {¶ 92} Telxon alleges that the trial court erred on multiple grounds by entering the damages award. The jury awarded over $218 million in consequential damages based on SMI's expert quantification of "lost profits"; the anticipated profit SMI would have made during the ensuing three years if Telxon had provided the $3.73 million investment in 1997 and taken Smart Handle to market. However, despite an immediate infusion of over $7 million, an additional $12 to $15 million, and the passage of several more years, this product has never made it to market and never made any profit. Telxon asserts that the award is insupportably speculative, is based on inadmissible evidence, and is grossly excessive.[16] We agree.
 {¶ 93} The decision to grant or deny a motion for directed verdict or judgment notwithstanding the verdict is reviewed de novo. Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4. The decision to grant or deny a motion for a new trial pursuant to Civ.R. 59(A) is reviewed for an abuse of discretion. Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312. The decision of whether a remedy is available and appropriate is a question of law, which is reviewed de novo. Entergy Ark., Inc. v. Nebraska (C.A.8, 2004),358 F.3d 528, 553-54. The decision on a particular jury instruction is reviewed for an abuse of discretion. State v. Wolons (1989),44 Ohio St.3d 64, 68. Thus, we must determine the available and appropriate remedies for each cause of action, and whether the requirements for each have been satisfied, as a matter of law, and if so, then review the instructions to the jury on those remedies for abuse of discretion.
 {¶ 94} In the present case, the jury completed general verdict forms and several additional pages of questions, constituting 10 interrogatories. The general verdicts awarded $212,340,880 to SMI and $6,266,000 to Dupre. According to the interrogatories, these total damage awards were apportioned as follows:

 SMI:
 I-1 Negligent Misrepresentation $ 3,730,000
 I-7 Breach of Contract $ 100,610,880
 I-10 Lost Future Profits $ 108,000,000
 ____________
 Total $ 212,340,880
 Dupre:
 I-1A Negligent Misrepresentation $ 185,000
 I-7A Breach of Contract $ 681,000
 I-10A Lost Future Profits $ 5,400,000
 ____________
 Total $ 6,266,000

While the jury specifically found for SMI and Dupre on each of their other claims,[17] none of those interrogatories asked for, or provided for, individual damages for those other claims. However, for purpose of this appeal, rather than strictly limit the awards to the particular causes of action stated in the interrogatories, we can infer that the damages were awarded generally, on the basis of three broad categories: Tort, including negligent misrepresentation, intentional misrepresentation, fraud, and interference with a business relationship; Contract; and Equity, being estoppel.
 {¶ 95} In addition to apportioning the damages by legal claim, the interrogatories provide additional insight into the verdict and award. The jury indicated in Interrogatory Number 1 (I-1) that SMI was 40% negligent, and in I-1A that Dupre was 20% negligent, yet no calculations were presented to off-set the total damage awards. In I-6, the jury found that SMI failed to mitigate its tort and estoppel damages, and could reasonably have avoided $26,000,000 in damages had it done so, yet no calculations were performed to off-set the total damage awards.[18] In I-7, the jury back-calculated its contract damage award, first specifying $100,610,880 for the breach of contract, then after finding that SMI could have mitigated another $26,000,000 on the contract issue, the jury calculated a gross value of $126,610,880. It is this exact and peculiar number ($100,610,880) that was discussed in the first assignment of error, supra ¶ 17. Also, it is indisputable that this number was meant to represent lost profits. In I-10 and I-10A, the jury specified that certain amounts ($108,000,000 and $5,400,000) also represented lost future profits, although they did not specify an underlying legal basis.
 {¶ 96} Ignoring for the moment that a directed verdict should have been granted on each cause of action, as discussed under "Telxon's Second Assignment of Error," supra ¶¶ 28-91, we consider the particular remedies available for each cause of action, and the limitations on those remedies. In so doing we find that, even if SMI and Dupre had met the elements of their claims, the damages awarded are insupportable as a matter of law. A new trial would be warranted upon a finding of excessive damages, "appearing to have been given under the influence of passion or prejudice." Civ.R. 59(A)(4). A directed verdict would be warranted, upon viewing the evidence most favorably to SMI or Dupre, in that reasonable minds could come to only one conclusion and that in favor of Telxon. See Civ.R. 50(A)(4).
 {¶ 97} Regarding excessiveness: "In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive." Moskovitz v. Mt. SinaiMed. Ctr. (1994), 69 Ohio St.3d 638, 655, 1994-Ohio-324, citing Toledo,Columbus Ohio River R.R. Co. v. Miller (1923), 108 Ohio St. 388, 402-03. Certain aspects of this award indicate that it may be "manifestly excessive," such as the failure to deduct for contributory negligence, the failure to deduct for damages that could have been mitigated, the obvious back-calculation, and the duplicative award of lost future profits under both the breach of contract claim and the overall award. It is fundamental that a plaintiff cannot recover twice on the same incident. P.C. S.L.R.R. Co. v. Hedges (1884), 41 Ohio St. 233, 233-34. See, also, Titanium Industries v. S.E.A, Inc. (1997), 118 Ohio App.3d 39,52. These duplicate damages awards, even without the other aspects, indicate manifest excessiveness and justify a new trial. However, even the individual awards are insupportable.
 {¶ 98} We begin by recognizing that tort remedies are not available for contract causes of action:
"The law of torts is well equipped to offer redress for losses suffered by reason of a `breach of some duty imposed by law to protect the broad interests of social policy.' Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts." (Internal citations omitted.) Floor Craft FloorCovering, Inc. v. Parma Community Gen. Hosp. Assn. (1990), 54 Ohio St.3d 1,7.
However, because the jury awarded damages for each of our three cause of action categories, we will briefly discuss each before explaining the limitations.
 {¶ 99} The remedies available for a tort claim differ based on mental state of the tortfeasor (intent as opposed to negligence), as this Court has explained:
"A party cannot recover under theories of both fraud and negligence based upon the same course of conduct. * * * As long as the element of inadvertence remains in conduct it is not willful. Negligence and willfulness are mutually exclusive terms, implying radically different mental states. * * * While a plaintiff may allege, in the alternative, both fraud and negligent misrepresentation as to the same course of conduct, a defendant cannot be found to have committed an act both intentionally and negligently. As to [a defendant's] conduct in the business transaction at issue, it could be either intentional or negligent, but it could not be both. Where fraud and negligent misrepresentation are claimed as to the same set of underlying facts, if fraud is proved, then the claim of negligent misrepresentation is necessarily subsumed thereby." (Internal citations, quotations and paragraph breaks omitted.) Textron Fin. Corp. v. Nationwide Mut. Ins. Co.
(1996), 115 Ohio App.3d 137, 148-49.
The jury in the present case found Telxon liable for both fraud and negligent misrepresentation, among other things, upon the single act of failing to fulfill the alleged promise and awarded damages for both, which again causes us to question the verdict's legitimacy. However, for purpose of this analysis, the critical point of law is that each cause is entitled only to its own theory of damages. See id. at 151.
 {¶ 100} The remedies available for negligent misrepresentation are limited to only actual damages; a plaintiff is not entitled to the benefit of the contract. McCarthy, Lebit, Crystal Haiman Co., L.P.A.v. First Union Mgt., Inc. (1993), 87 Ohio App.3d 613, 633; Harrellv. Crystal (1992), 81 Ohio App.3d 515, 524. That is, negligent misrepresentation does not allow for consequential damages. Id. Thus, SMI and Dupre would not be entitled to consequential damages (i.e., lost future profits) under a negligent misrepresentation theory, but would be limited to only actual damages. And, even these actual damages must be proven to have been proximately caused by the negligent act. See Harrell,81 Ohio App.3d at 525.
 {¶ 101} The remedies available for intentional misrepresentation or fraud include both actual and consequential damages, such as lost future profits. Stuart v. National Indemn. Co. (1982), 7 Ohio App.3d 63, 69-70. However, such consequential damages are severely limited by concepts such as proximate cause, foreseeability, mitigation, remoteness and speculation. Guest v. Metker (Apr. 30, 1990), 5th Dist. No. CA-7985, 16-19; Dziedzicki v. Bonafine (Dec. 16, 1992), 9th Dist. No. 15597, *6. These limitations are analyzed further below.
 {¶ 102} The remedies for a promissory estoppel claim are reliance and expectation damages, which may include consequential damages such as lost profits. "[A] plaintiff may recover expectancy damages, including lost profits, in a promissory estoppel action where * * * the promise relied upon obligates the promisor into the future and those damages are demonstrated with reasonable certainty." ZBS Indus. v. Anthony CoccaVideoland (1994), 93 Ohio App.3d 101, 107. But, "[t]he remedy granted for promissory estoppel may be limited as justice requires." (Internal quotations and edits omitted.) Jemson v. Falls Village RetirementCommunity, LTD. (Aug. 14, 2002), 9th Dist. No. 20845, at *16, 2002-Ohio-4155. Therefore, the same limitations on any consequential damages still apply.
 {¶ 103} The remedies available for breach of contract also include both actual and consequential damages, such as lost future profits.Textron, 115 Ohio App.3d at 144. These consequential damages are similarly limited by the concepts of proximate cause, foreseeability, mitigation, remoteness and speculation. Id. at 146. Specifically, lost profits may be recovered only if: (1) foreseeable — the profits were within the contemplation of the parties at the time the contract was made; (2) proximately caused — the loss of profits was the probable result of the breach of contract; and (3) the profits are not too remote or speculative — they may be shown with reasonable certainty. Charles R.Combs Trucking, Inc. v. Intl. Harvester Co. (1984), 12 Ohio St.3d 241, syllabus at paragraph two.
 {¶ 104} Foreseeability requires that the "profits were within the contemplation of the parties at the time the contract was made." Id. at 244. Two problems present themselves. First, it is possible and even likely, that Telxon did not foresee any profits at all, but rather saw an impossible (or financially catastrophic) venture, which they chose not to pursue. This was the testimony offered by Telxon's former executives when called to testify at trial. Second, SMI had spent considerable effort in convincing Telxon that it had other suitors, such as Symbol and Fujitsu, pacing at their door, ready to invest if Telxon was unable or unwilling. In addition, it was ultimately SMI who broke off further negotiations, while Telxon had merely sought additional delay.
 {¶ 105} Proximate cause requires that "the loss of profits is the probable result of the breach of contract." Combs, 12 Ohio St.3d at 244. Otherwise stated, the damages must have been directly caused by the wrongful breach, not by something else. The most obvious point on proximate cause comes from the testimony of former Telxon employee Jim Traxler, who was the main advocate for Smart Handle during the 1996 negotiations. During his August 2003 trial testimony Traxler answered SMI's question on cross-examination:
"[SMI attorney]: And would you also agree with me that the supermarkets, the retailers liked it [Smart Handle]?
"[Traxler]: That's a difficult question to answer because if they liked it, by this time it would have been rolled out by a number of people. So there's still a good deal of skepticism about it."
This same common-sense reasoning guides our analysis today. According to SMI's overwhelming testimony, this can't-miss product should be in stores today. And yet it is not.
 {¶ 106} SMI principal founder Dennis Blaeuer testified in August 2003: "So I believe you'll see us in the market over the next 60 to 75 days." SMI's transactional attorney, Jack Gerstein, testified at trial in August 2003:
"[Telxon attorney]: Has SnapShopper, Inc., Smart Media, Inc., Blaeuer Group, or any other of the named entities, made one single sale of this product to anybody?
"[Gerstein]: I'm sure they haven't because it's still in development stage.
"[Telxon attorney]: Has the company received any revenue?
"[Gerstein]: I do not believe so, but I do not know that for a fact.
"[Telxon attorney]: Has any retailer signed up to purchase or agree to purchase the product?
"[Gerstein]: That's a closer question. Ahold definitely signed a letter of intent. Kroger said — I can't remember now what their letter was, so I don't know if they did a letter of intent or not. Both expressed strong interest.
"[Telxon attorney]: You said Ahold signed a letter of intent. You have seen this letter of intent?
"[Gerstein]: I believe I have.
"[Telxon attorney]: What is it they commit to do?
"[Gerstein]: You'd have to — I don't know the answer. I mean, it was a complex document, as I recall. Just as long as we're talking, I assume you knew more of this. Carrefour in France, I think that's France, it's a European company, I believe was willing to deal with us. But they required that we install them first and we said we're committed to the U.S. first. That is a gigantic company but it is in Europe and there are a lot of reasons to do it here first.
"[Telxon attorney]: So they made a commitment to you?
"[Gerstein]: No. It never got to that stage."
Ms. LuAnn McDermaid, one of the original founders of SMI, testified at trial during August 2003:
"[Telxon attorney]: Why hasn't your company and Fujitsu been able to bring [your product] to market?
"[McDermaid]: We — the most latest complication, which is all very technical, there was a refresh problem.
"[Telxon attorney]: In 1996 did Smart Media ever have an actual commitment from any advertising agency?
"[McDermaid]: No. But Dennis [Blaeuer] had several meetings and Mr. [Bob] McCann, as an advisor to our company, had conversations and verbal involvement that was indicating that they wanted to be involved, again, precipitated by our development stage.
"[Telxon attorney]: Has there been any testing, pilot testing done on any of these units yet?
"[McDermaid]: Yes. I believe that just in the last year [Bill] Dupre, they took it to H.E. Butt which where is H.E. Butt, Texas maybe, but I'm not sure on the location. H.E. Butt is a grocery-type store that's very innovative and I believe the focus group was down there.
"[Telxon attorney]: Have they bought any units, H.E. Butt?
"[McDermaid]: No.
"[Telxon attorney]: Are they committed to buying any units in light of this test program?
"[McDermaid]: I don't believe that was the purpose."
SMI's corporate counsel, Arthur Fillmore, testified at trial in 2003 on direct examination:
"[SMI attorney]: Mr. Fillmore, are you aware of the status of Smart Media vis-á-vis getting its product to market?
"[Fillmore]: Yes. I think that probably Smart Media will have a pilot store installed in October of this year [2003]. I think they'll start rolling out in a national chain early next year and hopefully that will begin their full scale rollout in the year 2004 and 2005.
"[SMI attorney]: And when you say that you believe those things will happen, is that based on your own firsthand knowledge and experience?
"[McCann]: It's based on conversations I've had in the past which led me to believe that if Smart Media were in the position it is today that would happen, yes."
On cross-examination, and interjection by the Court, Fillmore testified further:
"[Telxon attorney]: Do I understand correctly from reading this deposition in prep for today that in advising this company and in meeting people on its behalf, you have not encountered the response that Smart Media is too late, that Smart Media is behind the curve? That Smart Media has missed its window of opportunity. Is that correct?
"[Fillmore]: That's correct.
"[The Court]: What is correct?
"[Fillmore]: That Smart Media is not too late, it's not behind the curve and it hasn't missed the market.
"[The Court]: So that's your answer?
"[Fillmore]: That's my answer, yes."
Former President and CEO of SMI, Bob McCann, testified on direct examination in August 2003:
"[SMI attorney]: If they [the grocery stores] were all that interested, why didn't it happen?
"[McCann]: Why didn't it happen?
"[SMI attorney]: Yes.
"[McCann]: Well, you mean why didn't SnapShopper [Smart Handle] happen? The problem with SnapShopper was money from the very beginning. We never had sufficient funds. Most new products and new companies in the United States, and for that matter overseas, failed. The vast majority, well over 90 percent, fail for lack of adequate funding. SnapShopper was another example of that."
Finally, one of SMI's expert witnesses testified:
"[SMI attorney]: Do you have an opinion from the information that you know, or has been made available to you, when and/or if ever the SnapShopper [Smart Handle] product will be rolled out in stores?
"[SMI's Expert]: I believe it will be — it is pretty much — I'd seen the working unit, its pretty much ready to go. * * * Everything is moving forward. I would say it will be very shortly we'll see it in the marketplace."
On the other hand, Telxon produced an expert who had been promoting this very same idea as early as 1994, who testified on direct:
"[Telxon attorney]: You see any commercial potential for that [Smart Handle concept] today?
"[Telxon expert]: No, I do not.
"[Telxon attorney]: Why not?
"[Telxon expert]: Well, the idea has now been around for quite sometime. I came up with it in 1994, later research revealed a company called [K]lever Marketing that's been around for awhile. They were a successor to another company that deposited similar technology. Smart Media's working in this space. Qsol is another company that has been doing this. There are no, what we call, volume installations of this capability today.
You cannot go anywhere in this country and find a supermarket that's completely automated and provides this kind of capability. With that number of companies working in this space, you would have expected if it were a good idea at least one of them would have been successful by now.
"[Telxon attorney]: Are you aware of any company, other than some testing going on, being successful in the marketplace?
"[Telxon expert]: No. To my knowledge, there are no, again, volume deployments of this capability anywhere."
This expert testified about SMI, specifically:
"[Telxon attorney]: How do you evaluate something like this?
"[Telxon expert]: I generally read two or three new business plans every week. A business plan is a document that's submitted by someone who intends to start a new business.
Generally, the first thing that I look at are the individuals involved in the business. Do they have a background in what they're attempting to do? Are they well known industry players in what they intend to do? Can, for example, in enterprises like this we might ask, `Could the CEO of this company call up the CEO of Safeway or another grocery store chain and talk to him about perhaps playing golf or whether or not they're interested in buying a system? Do they have a personal relationship of some sort or could they obtain such a personal relationship?
"[Telxon attorney]: Did you ever see any evidence of that in regards to Smart Media?
"[Telxon expert]: No. That was actually one of the problems I had with this when I read through their business plan. They did not have a management team that seemed suited to this kind of business. They had an idea but they didn't have a management team that would be successful in pursuing this.
"[Telxon attorney]: Are most proposals funded?
"[Telxon expert]: Most proposals are not funded. Most business plans never get any money at all. Starting a new business is very difficult. You have to understand that we, as investors, have our pick of many, many, many good plans that we can look at and only a small percentage of those get funded. Some, many that are marginal in nature. Unfortunately, we never take any action on those.
"[Telxon attorney]: Do the ones that get funded always succeed?
"[Telxon expert]: No. That's another interesting thing about starting businesses. I've been involved in those start-ups now for the majority of my career. It is very difficult to build a successful business. There's simply so many variables. Competition, financing, technology, the management team. All kinds of things, and you really don't know in advance when you're thinking about funding when you start up a business whether or not they're going to be successful.
That's why the management team is most important. Will they be able to roll with the punches and do a good job under conditions that we can't really even anticipate?
"[Telxon attorney]: Let's talk a bit about projections. Can you tell the ladies and gentlemen of the jury what a projection is and how it fits into this?
"[Telxon expert]: A financial projection is an integral [component] of the business plan. Generally in the back there are tables and tables of numbers that say, `Here's how much money we're going to make and here's what we're going to spend it on.' These are, we call them financial projections because they're just that. They're guesses about how the business is going to go.
"[Telxon attorney]: Did you review projections for Smart Media?
"[Telxon expert]: I did several different sets of projections.
"[Telxon attorney]: And what is your opinion of those projections?
"[Telxon expert]: I don't believe that there's any basis in reality for their sales projections. They didn't provide any corroborating evidence, any backup evidence whatsoever that they would be able to sell at the rate that they thought they could.
For example, in their latest business plan they talked about over $700 million a year in sales in their fifth year of operations with margins, that's money left over after they bought all the equipment, in fact, after taxes as well, of greater than $500 million. I have never seen a business like that [i.e., that profitable].
"[Telxon attorney]: Do you have an opinion as to whether their projections are reasonable, accurate and sustainable?
"[Telxon expert]: I do not believe that those projections could be, in any way, construed as possible in reality."
He concluded his direct testimony:
"[Telxon attorney]: Do you have an opinion, sir, to a reasonable degree of certainty as to the viability of the Smart Media business concept?
"[Telxon expert]: I do. And I do not believe that a business of this type will ever be successful."
On cross-examination, this expert testified:
"[SMI attorney]: Do you know who Bill Dupre is?
"[Telxon expert]: I am familiar with his name, I don't recall his background.
"[SMI attorney]: You don't know anything about his background?
"[Telxon expert]: In my review of the business plan, I remember I read lots of business plans. I made notes as to his particular level of experience, yes.
"[SMI attorney]: And what was that level of experience?
"[Telxon expert]: Well, I cannot tell you right now specifically what I felt about Bill Dupre but we don't look at the individual manager except to come up with an assessment as to the management team as a whole.
"[SMI attorney]: Okay. From your recollection, were you aware that Bill Dupre worked a long time for VideoCart?
"[Telxon expert]: Yes. I'm aware of that.
"[SMI attorney]: And he was involved as far back as when VideoCart concept actual device was being developed. Are you aware of that?
"[Telxon expert]: Yes.
"[SMI attorney]: And he had input into the creation of that device?
"[Telxon expert]: Yes.
"[SMI attorney]: Okay. And subsequently after his time with Smart Media, are you aware that he is now the COO of Klever-Kart?
"[Telxon expert]: I am. I have reviewed that on the worldwide web recently.
"[SMI attorney]: But nevertheless you wouldn't consider him a qualified person as part of a management team for Smart Media?
"[Telxon expert]: Remember, that business was not successful and there were a number of critical flaws in that business plan. Again, it was referred to in the trade press as a fiasco. So I would not say that his experience there would be of great value.
"[SMI attorney]: That fiasco was funded by IBM to the tune of $60 million; is that correct?
"[Telxon expert]: I do not recall if that's the right number.
"[SMI attorney]: Okay. But that would be a fairly expensive fiasco, wouldn't it?
"[Telxon expert]: It was a very expensive fiasco."
A very expensive fiasco indeed. Telxon called another expert, the CFO of a large grocery store chain, to discuss his company's experience with this technology:
"[Telxon attorney]: You're saying the people, the store you chose [for the trial] was a store where you thought this would be a big seller?
"[Telxon expert]: Exactly. It was — the store was selected for a number of reasons, partly the demographics of the store, the people who shop there were reasonably well educated, a fairly younger group, people who would be technologically savvy and not uncomfortable with a new type of technology but — and the process that was gone through after getting those people to agree that they would try to try this out for a period of 6 to 12 months.
There were a number of things that had to happen in order to make it even workable to test and that is carts had to be retrofitted to fit totes in them so that it would facilitate people scanning, putting their stuff in it and once they're checked out, being able to readily move the stuff out to their vehicles.
We had to install special scales in the produce departments for random weight items, for instance, things like apples that are not sold by the pound and so there was cost associated with having to install those scales. But what we found was that even for this group of people who initially was enthused about trying this out, that it was frankly an abject failure because of the difficulties with scanning and the fact that it ultimately was slowing down people's time in the grocery store.
And one of the things that I have learned over the years is that people are interested in having a quick and efficient trip through the store and the Personal Portable Shopper wouldn't do that and more importantly, the prospect of being audited periodically, doing your shopping and scanning, then when you get to the front, being asked to step aside so that your purchases could be checked and verified was something that people really found very distasteful.
The other problem that people found that was a huge frustration was the concern with items that for one reason or another wouldn't scan as they were going through the store. So the issue was not really with the technology so much as it was with the operational issues that were experienced through the store.
So it was tried in one store, as I said in Lakewood, Ohio. One of our sister companies also tried it in one store in South Carolina with very similar results. It was not viewed positively by the customers or by the store operating people."
An abject failure. On cross-examination, when questioned by SMI's attorney, this witness testified:
"[SMI attorney]: I'm going to read to you verbatim what you wrote in that cover letter. `To summarize my opinion as a supermarket industry expert, the Smart Media SnapShopper concept is unworkable in practice and would not be adopted by supermarket retailers or accepted by supermarket customers.' Is that still your testimony?
"[Telxon expert]: Absolutely.
"[SMI attorney]: And that's still your opinion today?
"[Telxon expert]: Yes, it is.
"[SMI attorney]: Okay.
"[Telxon expert]: Particularly in light of the fact that the SnapShopper device and similar devices are still not used in the supermarket industry in the United States."
 {¶ 107} If Smart Handle was a viable product, it would be in stores by now. If it was truly capable of returning $200 million on a $3.73 million investment, then investors would be climbing over each other to invest. If Telxon's failure to provide the $3.73 million was the proximate cause of the harm, then the subsequent investments should have proven that to be the case. We conclude that even if Telxon had breached a promise to SMI, that breach was not the proximate cause of the alleged damages.
 {¶ 108} Remote or speculative means that both the existence and amount of lost profits must be shown with reasonable certainty. Gahanna v.Eastgate Props., Inc. (1988), 36 Ohio St.3d 65, syllabus.; Bobb,151 Ohio App.3d 63, 88.
"The damages may not be merely speculative, possible or imaginary. Although lost profits need not be proven with mathematical precision, they must be capable of measurement based upon known reliable factors without undue speculation. Evidence of lost profits from a new businessventure receive greater scrutiny because there is no track record upon which to base an estimate." (Internal citations and quotations omitted.)McNulty v. PLS Acquisition Corp., 8th Dist. No. 79025, 2002-Ohio-7220, at ¶ 87 fn.14.[19]
 {¶ 109} The Ohio Supreme Court has stated the specific measures by which this greater scrutiny may be satisfied:
"A new business may establish lost profits with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." AGF, Inc. v. Great Lakes HeatTreating Co. (1990), 51 Ohio St.3d 177, syllabus paragraph three.
Furthermore:
"AGF, Inc. imposes a substantiation requirement that raises the issue above the usual credibility call a court makes concerning a witness' testimony. The witness, or the party offering his testimony, must provide corresponding data that shows the witness' opinion testimony is reliable." (Internal quotations omitted.) Weidle v. Leist, 2nd Dist. No. 20296, 2004-Ohio-4693, ¶ 39.
This corresponding testimony includes such things as market surveys and business records of similar enterprises, as set out in AGF. Id. A new company's business plan alone is insufficient. Schonfeld v. Hilliard
(C.A. 2, 2000), 218 F.3d 164, 173 ("the entrepreneur's cheerful prognostications are not enough"). See, also, Piscitelli v. Chemstreams,Inc. (Jan. 27, 1993), 9th Dist. No. 15740, *6 (finding insufficient "financial documents which failed to demonstrate that Chemstreams was even a profitable enterprise"); Benham v. World Airways, Inc. (C.A.9, 1970), 432 F.2d 359, 360 ("The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise.").
 {¶ 110} Judge Posner of the U.S. Court of Appeals for the Seventh Circuit has articulated the overall policy and approach:
"But that leaves us with the question of undue speculation in estimating damages. Abrogation of the `new business' rule does not produce a free-for-all. What makes MindGames' claim of lost royalties indeed dubious is not any `new business' rule but the fact that the success of a board game, like that of a book or movie, is so uncertain. Here newness enters into judicial consideration of the damages claim not as a rule but as a factor in applying the standard. Just as a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate (unlike the ice factory in Marvell [Light Ice Co. v. General ElectricCo. (Ark. 1924), 162 Ark. 467, 259 S.W. 741], which did begin production, albeit a little later than planned), capitalizing fantasized earnings into a huge present value sought as damages, so a novice writer should not be permitted to obtain damages from his publisher on the premise that but for the latter's laxity he would have had a bestseller, when only a tiny fraction of new books achieve that success. Damages must be proved, and not just dreamed, though some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." (Internal citations and quotations omitted.) MindGames, Inc. v. Western Publishing Co., Inc.
(C.A.7, 2000), 218 F.3d 652, 658.
 {¶ 111} SMI and Dupre rely extensively on their expert's testimony, but as discussed under "Telxon's First Assignment of Error," supra ¶¶ 12-27, that testimony is questionable at best. In response, Telxon's expert summarized the most serious flaw in SMI's expert analysis:
"[Telxon attorney]: You mean that he [SMI's economic expert] accepted a prediction of the future as being true just because the date that he was predicting had passed?
"[Telxon expert]: Exactly.
"[Telxon attorney]: Well, let me ask you a question. If the weatherman on Sunday says its going to rain on the following weekend, and then it's the following weekend and Friday was a sunny day, does the fact that he predicted rain on Friday mean it rained on Friday?
"[Telxon expert]: No, it doesn't. But according to [SMI's expert's] approach it would.
"[Telxon attorney]: Because he [SMI's expert] assumed rain for Friday, even though it had been clear and that day had already taken place?
"[Telxon expert]: Right."
In addition, SMI's expert's opinion and report was based entirely on a business plan developed by SMI in February 2000, some three years after the event and almost 15 months after filing the lawsuit. This is not a proper foundation. See Schonfeld, 218 F.3d at 173; Piscitelli, supra at *6. Here is why: SMI's tantalizing business-plan projection for any 5-year span, which SMI's expert utilized in his modeling, predicts the following:
 Year 1 = loss of $14,053,000
 Year 2 = loss of $5,158,000
 Year 3 = profit of $48,155,000
 Year 4 = profit of $218,600,000
 Year 5 = profit of $355,568,000
 _______________________________________
 Total projected PROFIT = $603,112,000
 SMI's actual profit and loss:
 1996 = $0 revenue; lost $791,183
 1997 = $0 revenue; lost $376,045
 1998 = $0 revenue; lost $579,107
 1999 = $0 revenue; lost $2,820,934
 2000 = $0 revenue; lost $668,550
 ____________________________________________
 Total actual accumulated LOSS = $5,235,819
 AGF, Inc. asks for "economic and financial data." AGF, Inc.,
51 Ohio St.3d at syllabus paragraph three. There it is: a loss of more than $5.2 million over five years. At the end of this five year period, SMI's balance sheet depicted $1.83 million in accumulated debt, based on zero revenues and over $7 million of additional paid in capital. This is hardly representative of the fantasized $603 million profit used in the so-called "expert" evaluation.
 {¶ 112} AGF, Inc. also asks for "business records of similar enterprises." Id. As discussed previously under "Telxon's First Assignment of Error," supra ¶¶ 12-27, SMI sought to compare itself with two entirely dissimilar companies: Optimal Robotics Corp., a maker of free-standing scanning systems; and Catalina Marketing Corp., a maker of devices that print paper coupons. Meanwhile, SMI and Dupre entirely ignored two similar companies: Klever Marketing Co. and VideOcart Co., each of which attempted a shopping cart mounted device akin to Smart Handle, and yet was unprofitable and ultimately failed out of the business despite large capital investments.
 {¶ 113} Based on our review, we can only conclude that SMI and Dupre have not proven that these damage awards were proximately caused by the harm alleged, nor have they proven that these awards are anything more than a speculative "pie in the sky" "free for all." See MindGames,218 F.3d at 658. On whole, these awards are insupportable as a matter of law.
 {¶ 114} SMI responds that Telxon waived any claims to the inadmissibility of this expert evidence by failing to object to the expert testimony at trial. See Beckman v. Yellow Freight Systems, Inc.
(Feb. 12, 1997), 9th Dist. No. 17845, at *3. This argument misses the point. At this stage, the admissibility of the expert, the expert's testimony, or even the expert's report, is immaterial. As explained, the dual errors were the improper selection of remedies and the failure of the evidence at hand to satisfy even those remedies. This waiver argument is without merit.
 {¶ 115} SMI also argues that Telxon waived this entire claim of error by failing to timely object at trial to the damages award; that is, because Telxon's claims are based on allegedly inconsistent jury interrogatories, Telxon was obligated to object before the jury was discharged. See Civ.R. 49(B); Gamble v. Summit Cty. Dept. of Jobs, 9th Dist. No. 21450, 2004-Ohio-193, ¶¶ 5-6; Haehnlein v. Henry (1987),41 Ohio App.3d 233, 234. Once again, the argument misses the point. On its face, the general verdict is mathematically consistent with the interrogatories, and Telxon has not urged a claim of inconsistency in this respect. Rather, the error is within the award itself; the award of two separate future profits for a single harm is duplicative, irrational, and unsupportable under the law. See Cohen v. Todd (Aug. 25, 2000), 6th Dist. No. L-99-1305, *4; Digiannantioni v. Dillon (June 20, 1996), 10th Dist. No. 95 APE09-1198, *4-5. Moreover, such a result is likely reversible as plain error. Titanium Indus. v. S.E.A., Inc.
(1997), 118 Ohio App.3d 39, 52; P.C. S.L.R. Co. v. Hedges (1884),41 Ohio St. 233, 233-34. This waiver argument is without merit.
 {¶ 116} SMI also argues that Telxon waived any claims that the award was excessive by failing to request a related jury instruction. But, in fact, there was an instruction on excessiveness. So, this argument is without merit. SMI also argues that the jury is presumed to have followed the instructions the trial court gives, and therefore, it is presumed that the jury did not award duplicate damages. See Pang v. Minch (1990),53 Ohio St.3d 186, syllabus at paragraph four; Midwest Specialties, Inc.v. Firestone Tire Rubber Co. (1988), 42 Ohio App.3d 6, syllabus. But, this is not an unrebuttable presumption, and not only is it abundantly clear from the face of the interrogatories that the jury did in fact award duplicative damages, no other finding is possible. This argument is without merit.
 {¶ 117} Finally, SMI argues that the decision to deny a new trial is within the sound discretion of the trial court, and the court did not abuse its discretion in that regard. However, in support of this argument, SMI simply regurgitates the same speculative and unsupportable arguments that we have considered and rejected throughout this analysis. Thus, SMI's circular reasoning amounts to little more than an argument that the trial court did not abuse its discretion because it did not abuse its discretion. This is folly, and this argument is without merit.
 {¶ 118} In his own peculiar counterargument, Dupre alleges that his $5.4 million award (conspicuously labeled "lost future profits" in the jury interrogatory) was somehow NOT based on lost future profits, and therefore not duplicative or unsupported. This is a strained misrepresentation at best. Because this is unsupported by the record (and even verges on an active misrepresentation to this Court), it warrants no further discussion.
 {¶ 119} Finally, Mr. Dupre also contends that there was sufficient evidence to support his damages, as well as proof that he lost the benefit of his bargain with Telxon. However, upon a thorough review, we find that this argument is founded in the same speculative and unsupportable evidence and rationale that we have considered and rejected throughout this analysis. This argument is without merit. Overall, Telxon's third assignment of error is sustained.
 D. Telxon's Fourth Assignment of Error
"THE TRIAL COURT ERRED IN ALLOWING COUNTER-CLAIMANTS TO TRY THEIR TORT CLAIMS ON THE THEORY THAT TELXON ENGAGED IN A `RUSE' TO MISAPPROPRIATE TRADE SECRETS."
 {¶ 120} Telxon alleges that the trial court erred by admitting extensive evidence related to misappropriation of patents or trade secrets. Although SMI had previously dismissed its claim that Telxon misappropriated certain secrets involving Smart Handle, the trial court allowed SMI to dwell upon such alleged misappropriation, which the jury relied on to Telxon's prejudice by finding for SMI on its other claims. Telxon contends that this error warrants a new trial. We agree.
 {¶ 121} A trial court's admission of evidence is reviewed for abuse of discretion. State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶ 79. An abuse of discretion is more than an error of law or judgment, but rather a finding that the court's attitude is unreasonable, arbitrary or unconscionable, Blakemore, 5 Ohio St.3d at 219, from which we may not merely substitute our judgment for that of the trial court. Pons,66 Ohio St.3d at 621. The present argument is based on Evid.R. 403(A), which states:
"Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
Thus, the broad discretion ordinarily extended to the trial court may be somewhat limited here, due to the mandatory nature of the rule.
 {¶ 122} Telxon asserts that the Uniform Trade Secrets Act is the exclusive remedy for trade secret misappropriation, and displaces all other causes of action. R.C. 1333.67(A). SMI and Dupre respond that this case falls within an exception. Both sides of this argument are irrelevant. The fact is that SMI and Dupre had dismissed their misappropriation claim, and therefore, it was not properly before the court and not susceptible to pre-planned defense by Telxon. Yet, SMI and Dupre made this claim the centerpiece of their case; they routinely and repeatedly questioned witnesses about it, introduced extensive evidence regarding patents and secrets, and Dupre's attorney committed fully half of his closing argument to it.
 {¶ 123} The effect on the jury is clear. In one of the few interrogatories answered unanimously, Interrogatory 9 asked: "Do you find, by a preponderance of the evidence, that Smart Media owned and provided confidential information to Telxon?" The jury responded yes, 8 to 0. In the follow-up question:
"What was that confidential information?
"[Written in by the jury:] The Smart-Handle patent applicationand the Smart Handle Business Plan."
Therefore, the resulting prejudice is evident. The question becomes whether the evidence and argument presented would tend to confuse the issues or mislead the jury. We find that it would and did, and that the trial court abused its discretion.
 {¶ 124} SMI responds that this issue was never raised to the trial court, and is therefore waived for purpose of appeal. Akron v. Meyer, 9th Dist. No. 21882, 2004-Ohio-4457, ¶ 14. However, Telxon objected to this evidence numerous times throughout trial, and was repeatedly overruled. Rather than failing to identify this error, and thereby waiving it as SMI contends, this continuous overruling of objections likely enhanced the error. If the jury believed that the trial court judge was endorsing this line of questioning or evidence or theory, then, those jurors would give it more credence and perhaps misapprehend Telxon's objections as Telxon trying to keep something from them. Indeed, Telxon was trying to keep something from them: misleading evidence about an issue that was not before the court.
 {¶ 125} Viewing the three-week trial as a whole, it is reasonable to infer that the extensive evidence, argument, testimony and questioning about this non-issue had the effect of confusing and misleading the jury. Based on our review of the record, we find that the trial court abused its discretion in admitting this evidence. This assignment of error is sustained.
 E. Telxon's Fifth Assignment of Error
"THE TRIAL COURT ERRED IN ALLOWING A SHAREHOLDER TO RECOVER DAMAGES INDIVIDUALLY FOR AN ALLEGED CORPORATE INJURY."
 {¶ 126} Telxon alleges that the trial court erred as a matter of law by failing to dismiss Mr. Dupre's personal claim on the alleged breach of contract between the two corporations, Telxon and SMI. Among his damages, the jury awarded Mr. Dupre approximately $5.4 million, which was exactly five percent of the "lost future profits" awarded to SMI, as his personal compensation for lost future profits. Telxon asserts that Mr. Dupre, as a mere shareholder, cannot recover personally for an injury to the corporation. We agree.
 {¶ 127} The decision to grant or deny a motion for directed verdict or judgment notwithstanding the verdict is reviewed de novo. Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4. Under Ohio law, a mere shareholder cannot maintain an individual cause of action against a third party who harms the corporation, unless that shareholder was harmed in a way that the other shareholders were not. Adair v. Wozniak (1986), 23 Ohio St.3d 174, syllabus. In the present case, Dupre's harm was that the failure of the joint venture between SMI and Telxon caused him a financial loss. This is the exact same harm that fell upon every SMI shareholder. Thus, Dupre cannot maintain an individual action, and his cause of action should have been dismissed as a matter of law. The Adair Court's elaboration on the rule may clarify:
"Where the defendant's wrongdoing has caused direct damage to corporate worth, the cause of action accrues to the corporation, not to the shareholders, even though in an economic sense real harm may well be sustained by the shareholders as a result of reduced earnings, diminution in the value of ownership, or accumulation of personal debt and liabilities from the company's financial decline. The personal loss and liability sustained by the shareholder is both duplicative and indirect to the corporation's right of action." (Footnotes omitted.) Id. at 178.
Otherwise stated:
"As a general rule shareholders may not bring an action against a third party whose acts have impaired the capital position of the corporation. Even though such injury may affect the value of the corporation's stock, only a corporation and not its shareholders can complain of an injury sustained by, or a wrong done to, the corporation." (Internal quotations omitted.) Hershman's, Inc. v. Sachs-Dolmar Div. (1993),89 Ohio App.3d 74, 77.
It is true that Dupre proved at trial his own reduced earnings, diminution in the value of his ownership stake in SMI, and an excruciating accumulation of personal debt and liability. But, as explained by the quoted passages, these factors do not convert a purely corporate cause of action into a personal cause of action.
 {¶ 128} Dupre contends that he suffered a distinct harm as the result of a tortious breach of contract against him personally. As was explained under "Telxon's Second Assignment of Error," supra ¶¶ 28-91, we cannot agree. Rather, we find that even if a contract had arisen between Telxon and SMI, Dupre's claim must fail because Dupre was not individually a party to any supposed contract. The parties never anticipated any Dupre-Telxon contract, Dupre never offered or accepted, and Dupre offered no consideration for some reciprocal consideration by Telxon. If Dupre entered a contract, it was with SMI, not Telxon. At most, Dupre would have been an incidental third-party beneficiary to the purported SMIT-elxon agreement. An incidental third-party beneficiary has no rights to enforce the contract, see Bobb Forest, supra at ¶ 59, and under these circumstances, falls squarely within the field of shareholders, who similarly have no independent rights to enforce the contract or recover individually on that contract. Adair, 23 Ohio St.3d at syllabus. This assignment of error is sustained.
 F. Symbol's First Assignment of Error
"THE COURT OF COMMON PLEAS ERRED IN GRANTING DEFENDANT WILLIAM J. DUPRE'S RULE 25(C) MOTION TO JOIN SYMBOL TECHNOLOGIES, INC. AS A COUNTERCLAIM DEFENDANT, BECAUSE THERE HAS BEEN NO `TRANSFER OF INTEREST' FROM TELXON TO SYMBOL."
 {¶ 129} Symbol alleges that the trial court erred by joining Symbol to the judgment, because any transfer of interest between Telxon and Symbol was legally insufficient to satisfy Civ.R. 25(C). Notably, Symbol was joined to the lawsuit after the litigation was complete and the $218 million jury verdict had been rendered. Symbol contends that this joinder was improper. We agree.
 {¶ 130} Foremost, Symbol argues that the judgment against it must be set aside because the judgment against Telxon was in error, as has been confirmed above. While this is true, we will proceed to evaluate Symbol's assignments of error to ensure complete review of this appeal.
 {¶ 131} A trial court's decision to substitute or join a party under Civ.R. 25(C) is reviewed for abuse of discretion. Ahlrichs v. Tri-TexCorp. (1987), 41 Ohio App.3d 207, syllabus paragraph two. An abuse of discretion is more than an error of law or judgment, but rather a finding that the court's attitude is unreasonable, arbitrary or unconscionable,Blakemore, 5 Ohio St.3d at 219, from which we may not merely substitute our judgment for that of the trial court. Pons, 66 Ohio St.3d at 621. A trial court's factual finding of a de facto merger is reviewed for manifest weight to determine if it was "supported by competent, credible evidence." Titus v. Miles (Jan. 19, 1996), 6th Dist. No. L-94-372, at *9, citing C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. Of course, if the trial court incorrectly interpreted or applied either Civ.R. 25(C) or the de facto merger doctrine, then that interpretation or application is reviewed de novo. Kaple v. BenchmarkMaterials, 3rd Dist. No. 13-03-60, 2004-Ohio-2620, at ¶ 4.
 {¶ 132} Civil Rule 25(C) provides for the substitution or joinder of a new defendant to the action if the original defendant's interest in the action has been transferred to that new defendant during the course of litigation. Ahlrichs, 41 Ohio App.3d at 210. A motion for such an action may be granted only upon a finding of a transfer of interest. Id.; Civ.R. 25(C). See, also, Ohio Civil Practice § 169.04 (2005). In the present case, SMI and Dupre alleged to the trial court that Telxon had transferred its interest in the litigation to its new parent corporation, Symbol, and moved for substitution or joinder of Symbol to the action. The trial court granted the motion on the basis that Symbol's purchase of the controlling interest in Telxon was actually a de facto merger, which satisfied the transfer of interest requirement. For the reasons that follow, we disagree.
 {¶ 133} We begin with three basic doctrines. Foremost, a parent and a subsidiary corporation are distinct legal entities. White Motor Corp. v.Kosydar (1977), 50 Ohio St.2d 290, 296. Next, in the case of a merger, only the surviving corporation succeeds to the assets, property and rights of the two constituent corporations of the merger. HooverUniversal, Inc. v. Limbach (1991), 61 Ohio St.3d 563, 565, citing R.C.1701.82(A)(3). Finally, a corporation that purchases the assets of another may be liable for the liabilities of the predecessor corporation if that transaction amounts to a de facto merger. Welco Indus., Inc. v.Applied Cos. (1993), 67 Ohio St.3d 344, 1993-Ohio-191, syllabus (exception to the successor-liability doctrine).
 {¶ 134} It is the enthymeme to the third doctrine that reconciles the three: the de facto merger doctrine presupposes that the predecessor corporation no longer exists. "A de facto merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." Id. at 349. See, also, Flaugher v. Cone Automatic MachineCo. (1987), 30 Ohio St.3d 60, 65 ("The cases have required that the predecessor be dissolved or liquidated soon after the transfer of assets."). Indeed, the cases discussing this doctrine often speak of the "judgment proof" defendant. See, e.g., Explosives Corp. v. GarlamEnters. Corp. (C.A.1, 1987), 817 F.2d 894, 906; Minn. Mining Mfg. Co.v. Eco Chem, Inc. (C.A.Fed., 1985), 757 F.2d 1256, 1259; EEOC v. SWP,Inc. (N.D. Ind., 2001), 153 F. Supp.2d 911, 914.
 {¶ 135} In the present case, it is undisputed that Telxon still exists, albeit as a wholly owned subsidiary to Symbol. As such, the de facto merger doctrine does not apply. There was no transfer of interest sufficient to satisfy Civ.R. 25(C). The trial court erred in applying Civ.R. 25(C) in these circumstances. To clarify, it is important to remember that Symbol and Telxon were independent entities before the takeover. The mechanics of the takeover involved a merger of Telxon with TX Acquisition Corp. (TX), a Symbol subsidiary, wherein Telxon was acquired by TX but remained as the surviving corporation. Thus, former competitor Symbol became Telxon's parent corporation and sole shareholder in a reverse triangular merger. Telxon remains separately incorporated under Delaware law.
 {¶ 136} Ironically, it is Dupre who urges this Court to rely on In reAcushnet River New Bedford Harbor Proceedings (D.C. Mass., 1989),712 F.Supp. 1010, as instructive of this issue and that opinion explains our conclusion with a certain pithiness:
"Acquiring Belleville through a wholly-owned subsidiary was an effective way for RTE to protect itself from liability. The acquisition's structure did not, however, insulate Aerovox from succeeding to Belleville's liability." (Emphasis in original; internal citations omitted.) Id. at 1017.
The equivalent statement in the present case would be:
Acquiring Telxon through a wholly-owned subsidiary was an effective way for Symbol to protect itself from liability. The acquisition's structure did not, however, insulate TX from succeeding to Telxon's liability.
Of course, TX has expired post-merger and any liabilities it may have had would succeed to the surviving corporation, Telxon. As another example:
"The record reflects that MedPartners, a large publicly held corporation, was in the business of managing physician practices.
EPS was a small privately held corporation owned by 62 actively practicing emergency room physicians. MedPartners acquired EPS through a `reverse triangular merger' by forming a wholly owned subsidiary called EPS Merger Corporation. EPS Merger was then merged with and into EPS. EPS, as the surviving corporation, then became a wholly owned subsidiary of MedPartners. The merger was accomplished by the exchange of all outstanding shares of EPS for $44,000,000 of MedPartners common stock.
"* * *
"EPS, as the surviving corporation after the merger with EPS Meger Corporation, succeeded to the assets, property and rights of the constituent entities, EPS and EPS Merger Corporation. MedPartners, because it was not a party to the merger, was not the surviving corporation and did not succeed to any assets, property or rights of EPS. EPS did become a wholly owned subsidiary of MedPartners and was, under White Motor Corp. [50 Ohio St.2d at 296] and Hoover Universal [61 Ohio St.3d at 565], a distinct legal entity. Therefore, while Calfee owed a duty to EPS, it did not owe a duty to MedPartners." Medpartnersv. Calfee, Halter, Griswold LLP (2000), 140 Ohio App.3d 612, 613 
617.
Just as no duty runs to the parent corporation in the above case, liability will not run to Symbol in the present case.
 {¶ 137} SMI responds that Civ.R. 25(C) joinder of a party prior to entering judgment is within the sound discretion of the trial court, and the trial court did not abuse its discretion in finding a sufficient transfer of interest to support its decision. As discussed above, the trial court's application of Civ.R. 25(C), no matter the timing, was improper as a matter of law, and must be reversed.
 {¶ 138} Mr. Dupre argues that Symbol's acquisition of Telxon, as demonstrated by its stripping of Telxon's assets and payment of Telxon's liabilities, was a sufficient transfer of interest to join Symbol to the judgment under Civ.R. 25(C). However, Symbol's treatment of its subsidiary Telxon does not overcome the fundamental doctrine that a parent and a subsidiary corporation are distinct legal entities. WhiteMotor, 50 Ohio St.2d at 296. As emphasized repeatedly throughout Symbol's brief on appeal, if Dupre's position is that Symbol has breached the formalities that separate corporate entities and is merely hiding behind the corporate veil, then he must plead and prove such a charge to pierce that corporate veil. Belvedere Condominium Unit Owners' Assn. v. R.E.Roark Cos. (1993), 67 Ohio St.3d 274, 288-89, 1993-Ohio-119. See, also,Cytec Indus. v. B.F. Goodrich Co. (S.D. Ohio, 2002) 196 F. Supp.2d 644,655 ("For Goodrich to be held liable for Harmon Color's CERCLA liability as the parent corporation, there would have to be justification for piercing the corporate veil."). Dupre did not do so in this case. Symbol's first assignment of error is sustained.
 G. Symbol's Second Assignment of Error
"THE COURT OF COMMON PLEAS VIOLATED SYMBOL'S RIGHT TO DUE PROCESS BY JOINING SYMBOL AS A DEFENDANT AFTER THE JUDGMENT AGAINST TELXON."
 {¶ 139} Symbol alleges that the trial court violated its fundamental right to due process. Specifically, Symbol asserts that it is not a successor in interest to a named party, but rather, a new and independent defendant with the right to notice and an opportunity to be heard. Assuming this to be true, then by exercising a post-judgment joinder, the trial court violated due process. We agree.
 {¶ 140} As a matter of law, we review this question de novo. Maumeev. Publ. Util. Comm., 101 Ohio St.3d 54, 2004-Ohio-7, ¶ 3. The United States Supreme Court has held that a party cannot be joined to a case after the judgment, as it would be a clear violation of due process.Nelson v. Adams, USA, Inc. (2000), 529 U.S. 460, 468, 146 L.Ed.2d 530. Therefore, having found that Symbol was not a successor in interest to Telxon but rather that the two are separate entities; we must find that to join Symbol is to join an entirely new party. Furthermore, to join Symbol at the judgment stage violates due process.
 {¶ 141} SMI responds that Symbol was not joined after the judgment, but was joined in the same filing that entered the judgment. We do not find this difference relevant. The clear fact is that Symbol was joinedafter the jury returned a $218 million verdict against Telxon, upon which the court entered judgment. Moreover, Symbol was joined after the completion of the litigation that ultimately resulted in that $218 million judgment to which it was being bound.
 {¶ 142} SMI and Dupre also argue that Symbol received notice at the beginning of trial of potential liability under Civ.R. 25(C), was allowed to brief the trial court on the issue, and was offered an evidentiary hearing, which it opposed as unnecessary. While this argument might have merit if Symbol had legitimately been a successor in interest to Telxon and had been properly substituted as a mere successor in interest under Civ.R 25(C), SMI and Dupre have both insisted that Symbol was joined, not substituted, on the basis of de facto merger, even though Telxon remains in existence. Thus, Symbol was joined as liable to the outcome of the litigation without the opportunity to participate in the litigation. Such imprecise notice and after-the-fact opportunity to be heard are not the adequate assurance of a fair trial that is ordinarily envisioned by due process. Symbol's second assignment of error is sustained.
 H. Symbol's Third Assignment of Error
"THE COURT OF COMMON PLEAS ERRED BY JOINING SYMBOL TO ANY JUDGMENT ENTERED IN FAVOR OF SMART MEDIA, WHICH EXPRESSLY WAIVED ANY RIGHT TO SUCH RELIEF."
 {¶ 143} Symbol alleges that SMI waived any right to enforce its judgment against Symbol by dismissing its Civ.R. 25(C) joinder motion prior to the court's decision. We disagree.
 {¶ 144} Symbol cites no law to support this position. SMI and Dupre respond that the trial court's joinder of Symbol to the judgment, assuming it to be proper, would apply universally to all parties affected by that decision. We find this to be the more persuasive position. Otherwise stated, as the appellant, Symbol did not meet its burden on appeal. See App.R. 16(A)(7); Loc.R. 7(A)(7). This assignment of error is overruled.
 I. Symbol's Fourth Assignment of Error
"THE COURT OF COMMON PLEAS ERRED BY ENTERING JUDGMENT AGAINST SYMBOL BECAUSE THE UNDERLYING VERDICTS AGAINST TELXON ARE LEGALLY DEFECTIVE AND MUST BE REVERSED, AND/OR A NEW TRIAL AWARDED, FOR REASONS EXPLAINED IN DEPTH IN TELXON'S SEPARATE APPEAL ON THE MERITS."
 {¶ 145} Symbol reasserts Telxon's assignments of error, and argues that a legally deficient judgment against Telxon may not be upheld against Symbol. We agree.
 {¶ 146} SMI and Dupre do not dispute the basic premise that an invalid judgment against Telxon is equally unsustainable against Symbol, but rather, each responds that the judgment against Telxon is valid. For all of the reasons set forth under Telxon's assignments of error, the judgment against Telxon is insupportable. As such, there would be no liability to transfer to Symbol even if such transfer were available. Symbol's fourth assignment of error is sustained.
 J. Mr. Dupre's First Cross-Assignment of Error
"THE TRIAL COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY ON PUNITIVE DAMAGES."
Mr. Dupre's Second Cross-Assignment of Error
"THE TRIAL COURT ERRED WHEN IT REFUSED TO GRANT PREJUDGMENT INTEREST ON THE JURY'S VERDICT IN FAVOR OF DUPRE."
 {¶ 147} Mr. Dupre attempted to file a cross appeal. While an appellee need not file a separate appeal to pursue a cross-appeal, that appellee/cross-appellant must still comply with the appellate rules and timely file the cross appeal with the trial court, just as an appeal must be timely filed with the trial court. See App.R. 3(C)(1); Loc.R. 1(B)(3) 2(A). If it has not been filed with the trial court, the cross-appeal has not been perfected, this court lacks jurisdiction and the cross-appeal must be dismissed. We find that Mr. Dupre did not file his cross-appeal with the trial court. Accordingly, Mr. Dupre's cross-appeal is dismissed.
 III. {¶ 148} Telxon's five assignments of error are sustained. Symbol's first, second and fourth assignments of error are sustained, while its third assignment of error is overruled. Mr. Dupre's attempted cross-appeal is dismissed. Therefore, Telxon would be entitled to a new trial; however, Telxon is entitled to a directed verdict on all counts, and a new trial is unnecessary. The decision of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause remanded for entry of judgment consistent with this decision.
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to the parties equally.
Exceptions.
Slaby, P.J., concurs
[1] Essentially, these non-disclosure agreements restricted either party from revealing the confidential information discussed during the impending negotiations. In particular, these agreements protected the patented or otherwise secret aspects of SMI's (a.k.a. Dennis Blaeuer's) Smart Handle invention.
[2] Exactly how SMI's expert's report arrived in the jury room is unknown and hotly contested. When it was first discovered and called to the court's attention, sometime well after rendition of the verdict, the attorneys for SMI and Dupre denied that it had even occurred. The trial court put a quick end to these denials by retrieving the evidence provided to the jury and finding the report included therein. Forced to admit that the report had been delivered to the jury room, these same attorneys then denied that it was their fault. Based on the post-trial hearing concerning this issue (which included statements by the court clerk and bailiff), it appears that the parties all reviewed their exhibits together and then each side independently submitted their exhibits to the bailiff for delivery to the jury room. Thus, granting benefit of the doubt, it appears that SMI and Dupre's attorneys inadvertently failed to remove the expert report from their trial exhibits before submitting them to the bailiff, who then unknowingly sent it to the jury room.
[3] The Lester Court also explained that, under Missouri law, the judge had no discretion to send the particular charts to the jury room.Lester, 850 S.W.2d at 864. In Ohio, "[s]ending properly admitted evidence into jury deliberations rests within the sound discretion of the trial judge." State v. McGuire (1997), 80 Ohio St.3d 390, 396, 1997-Ohio-335. However, in both the Lester case and the present case, the exhibits in question were never actually admitted into evidence, so this discrepancy is immaterial to the outcome. Furthermore, this facet of Missouri law does not change the Lester Court's reasoning.
[4] The Jimenez case involved several errors, including other irregularities in the jury deliberations, a probable juror bias based on plaintiff's national origin, and a prejudicial remark by defense counsel during closing argument. Jimenez, 792 F.Supp. at 914. However, the court expressly stated that, "[a]ny of the three incidents would be sufficient by itself to grant plaintiff's motion for new trial." Id.
[5] Telxon also complains of another exhibit that was sent to the jury room without being admitted into evidence, alleging that an unidentified depiction of a Smart Handle type device would cause the jurors to look to the exhibit index for a description, where the exhibit number was mislabeled as Symbol's promotional literature. According to Telxon, this would cause the jurors to conclude mistakenly that Telxon had misappropriated the Smart Handle concept and given it to its parent, Symbol, who was then marketing it as their own. While we find this theory attenuated, we also find that we need not address this particular claim. The SMI expert report is sufficient on its own to allow for a determinative analysis of error under these circumstances. Also, "Telxon's Fourth Assignment of Error," infra at ¶¶ 120-125, addresses the misappropriation claim.
[6] Three juror affidavits included assertions that: "The deliberations included reference to and discussion about dollar amounts set forth in [SMI's economic expert's] report"; and "The other jurors commented on the fact that they did not have [Telxon's expert's] report and had [SMI's expert's] report."
[7] See "Telxon's Third Assignment of Error," infra at ¶¶ 92-119, for a detailed discussion of the damages awards in this case.
[8] See "Telxon's Third Assignment of Error," infra at ¶¶ 92-119, for a detailed discussion of the damages awards in this case.
[9] For additional discussion of VideOcart and Klever-Kart, see infra at ¶¶ 106 112.
[10] "An exception to this rule exists, however, where an individual makes a promise concerning a future action, occurrence, or conduct, and, at the time he makes it, has no intention of keeping the promise."Williams v. Edwards (1998), 129 Ohio App.3d 116, 124. Although SMI and Dupre have accused Telxon of entering negotiations for an unsavory purpose and without any intent to fulfill its promises, we find this accusation unsupported and flatly contradicted by the evidence, even as viewed in the light most favorable to SMI and Dupre. Furthermore, as under the analysis which follows, this exception does not apply to the circumstances of the present case, where the alleged unfulfilled promise is not a collateral statement designed to induce contract formation, but rather, the promise upon which the purported breach of contract is premised. See id.
[11] SMI and Mr. Dupre also claimed breach of contract based on Telxon's alleged misuse of the confidential information protected by the non-disclosure agreements and Smart Handle patents. While the sameit-is-no-tort-to-breach-a-contract analysis would apply to dispose of any tort claims that were alleged based on this contractual predicate, claims regarding misappropriation of this confidential information are better addressed under "Telxon's Fourth Assignment of Error," infra at ¶¶ 120-125.
[12] See "Telxon's Third Assignment of Error," infra at ¶¶ 92-119, for a detailed discussion of the damages awards in this case.
[13] In its judgment entry, the trial court cited Balbach v. AkronMetro. Hous. Auth. (Feb. 6, 1987), 9th Dist. No. 12292, at *11-12, for the proposition: "The determination of whether a contract exists is a question of fact for the jury." The trial court then proceeded to quote from that case: "[T]he determination of the existence of the implied contract . . . is one that is within the exclusive province of the jury."
However, in our review of Balbach we find that the subject of the appeal was not the existence of a contract, but the meaning of the terms in an employee handbook, as would be interpreted by a reasonable person in an action concerning termination for cause versus employment at will. Furthermore, the holding was not so broad as was suggested by the trial court. Only through liberal use of ellipses has it been transformed into apparent black letter law on the interpretation of contracts. The original reads:
"However, such manuals or handbooks standing alone, absent evidence of consideration or detrimental reliance or forbearance, would seldom be sufficient to overcome the employment-at-will doctrine. Even assuming that this were not the case, the determination of the existence of the implied contract evinced by the handbook is one that is within the exclusive province of the jury. The trier of fact must necessarily determine the agreement's explicit and implicit terms concerning discharge." (Emphasis added; internal quotations omitted.) Balbach, at *11-12.
Thus, we need not reconsider the Balbach holding in light of the present case.
[14] By the time of trial in August-September 2003, Telxon had been reorganized after the Symbol buy-out and none of Telxon's witnesses were employed by Telxon or Symbol any longer. Some had even been fired. Thus, they were all, at least facially, disinterested or hostile to Telxon. Conversely, each of SMI's principal witnesses had a financial stake in the outcome of the litigation. However, as we have repeated throughout this analysis, for the purposes of this review, we accept SMI's evidence as the more credible.
[15] See "Telxon's Fourth Assignment of Error," infra ¶¶ 120-125, for a discussion of this issue.
[16] Telxon also explains that by awarding SMI both the $3.73 million that would have been invested and the $208.6 million that would theoretically have resulted if it had been invested, the award is inherently duplicative.
[17] In addition to the interrogatories specifically discussed, the jury also found for SMI on its estoppel (interrogatory I-4), intentional misrepresentation (I-5), and fraud (I-8) claims and for Dupre on his tortious interference with a business relationship (I-3), estoppel (I-4A), intentional misrepresentation (I-5A), and fraud (I-8A) claims. Each of these findings had six votes in favor, and while the other two votes were often opposed, occasionally one or both would write in that they "abstained." Obviously, this causes one to question this jury's faithfulness to the instructions and its commitment to full deliberation, but this issue was not put before us, so we will not delve into it further.
In I-9, the jury found that Telxon had misused confidential information. This is addressed under "Telxon's Fourth Assignment of Error," infra at ¶¶ 120-125. In I-9A, the jury found that Dupre did not possess any confidential information.
[18] In I-6A the jury found that Dupre failed to mitigate his tort and estoppel damages, but even had he exercised reasonable care he could have mitigated $0. Again, this gives us cause to question this jury's faithfulness to the instructions and its commitment to full deliberation, but it is otherwise irrelevant to this analysis.
[19] Indeed, some courts have refused to award any lost profits to a new business — as a matter of law. "The law is well established that loss of profits from a new business enterprise is too speculative to be allowed as an element of damage. Only where the evidence establishes a history of profitable operations, followed by the actionable wrong and a diminution of profits, can there be any recovery." Sambo's of Ohio, Inc.v. City Council of Toledo (N.D. Ohio, 1979), 466 F. Supp. 177, 181, citing McBrayer v. Teckla, Inc. (C.A.5, 1974), 496 F.2d 122.